[Cite as *State v. Reese*, 2021-Ohio-3506.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                           Court of Appeals No. L-20-1111

      Appellee                                      Trial Court No.  CR0201902687

v.

Edward Reese                                        **DECISION AND JUDGMENT**

      Appellant                                    Decided:  September 30, 2021

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Sarah R. Anjum, for appellant.

* * * * *

**ZMUDA, P.J.**

## I.  Introduction

{¶ 1} Appellant, Edward Reese, appeals the judgment of the Lucas County Court of Common Pleas, sentencing him to an indefinite prison term of five to seven and one-half years after it found him guilty of one count of participting in a criminal gang.

## A. Facts and Procedural Background

{¶ 2} On September 26, 2019, appellant and two codefendants (Carlson Brown and Kenneth Allison) were jointly indicted on one count of aggravated murder in violation of R.C. 2903.01(A) and (G), an unspecified felony, one count of murder in violation of R.C. 2903.02(B) and 2929.02, an unspecified felony, one count of felonious assault in violation of R.C. 2903.11(A)(1) and (D), a felony of the second degree, two counts of felonious assault in violation of R.C. 2903.11(A)(2) and (D), felonies of the second degree, one count of improperly discharging a firearm at or into a habitation in violation of R.C. 2923.161(A)(1) and (C), a felony of the second degree, one count of participating in a criminal gang in violation of R.C. 2923.42(A) and (B), a felony of the second degree, and one count of improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B) and (I), a felony of the fourth degree. These charges were related to a July 14, 2019 drive-by shooting that occurred at 3390 Woodrow Boulevard, Toledo, Ohio, resulting in the death of G.S. The charge of participating in a criminal gang was based upon conduct taking place over a five-year period commencing on September 26, 2014, and ending on the date the indictment was filed.

{¶ 3} After appellant entered a plea of not guilty, the matter proceeded through pretrial discovery and motion practice. Eventually, appellant and Brown waived their

2.

rights to a jury trial and the matter proceeded to a six-day bench trial in which appellant and Brown were tried together.[1]

{¶ 4} During its case-in-chief, the state called 22 individuals. Some of these witnesses provided testimony directed at Brown's participation in the drive-by shooting, and thus the testimony provided by those witnesses will not be summarized here. Of those witnesses who provided testimony relevant to appellant, there were four eyewitnesses to the shooting. While the eyewitnesses were called by the state later on in its case-in-chief, we will summarize their testimony prior to examining the testimony of the remaining relevant witnesses.

{¶ 5} The first eyewitness called by the state was Emilio Hernandez. Hernandez resides in a home that is located on Manhattan Boulevard near the scene of the shooting. On July 14, 2019, Hernandez decided to go to the store. Upon his return, Hernandez parked his vehicle in front of his house. While Hernandez was still in his vehicle, he noticed a white sedan approach from the west and stop in the road to his left.

{¶ 6} After the sedan stopped, Hernandez, a United States Army veteran, noticed "two arms come out of the car both with semi-automatic handguns and [start] opening [fire]." Hernandez indicated that he could not see the faces of the individuals who fired the weapons. However, Hernandez testified that he saw their arms, which were tattooed, and stated that the individuals were African American.

---

[1] Allison exercised his right to a trial by jury and was tried separately.

3.

{¶ 7} Approximately 25 seconds after the shooting stopped, Hernandez exited his vehicle and made his way to the porch on which G.S. was shot. After learning that G.S. was shot, Hernandez began to apply pressure to the gunshot wound and waited for paramedics to arrive.

{¶ 8} Next, the state called Randolph Canales. Like Hernandez, Canales lives in a home located on Manhattan Boulevard, near the scene of the shooting. According to Canales, he was doing concrete work in front of his home at the time of the shooting. Canales testified that he saw two vehicles approach the scene, which he identified as a blue or green van and a white sedan. The vehicles slowed down as they approached, and Canales witnessed a "volley" of shots fired toward the residence located at 3390 Woodrow Boulevard by occupants of the vehicles. Consistent with Hernandez's testimony, Canales observed two shooters in the white sedan, one from the front passenger seat and one from the rear passenger seat. Canales also witnessed at least one shooter firing a weapon from the van. After the shooting stopped, the vehicles fled the scene heading eastbound on Manhattan Boulevard.

{¶ 9} Canales' live-in girlfriend, Judith Daudritch, was called by the state following Canales' testimony. Daudritch testified that she was at her Manhattan Boulevard home all day on July 14, 2019. Just prior to the shooting, Canales asked Daudritch to come outside to see the concrete work he had just completed. Daudritch witnessed the shooting, and recounted seeing one handgun hanging out of the front

4.

passenger window of the sedan, one handgun hanging out of the rear passenger window of the sedan, and two handguns hanging out of the front passenger window of the van.

{¶ 10} As its fourth eyewitness, the state called Marlon Powell. In 2019, Powell was charged with having a weapon while under disability, possession of drugs, and failure to appear. In exchange for his agreement to testify in this case, the state reduced the charges to carrying a concealed weapon and failure to appear, and recommended a community control sentence in lieu of prison. At the time of his guilty plea, Powell was on parole relating to a prior conviction for participating in a criminal gang.

{¶ 11} At the outset of his testimony, Powell explained that the Cherrywood Crips and the Geer Gang Crips are rival gangs in Toledo. Powell stated that these gangs "beef," meaning they fight with (and sometimes shoot) one another. According to Powell, this rivalry began in 2013 with the death of a gang member named Shamar. As of the time of trial, the rivalry between the two gangs remained active.

{¶ 12} Powell testified that he was at the residence located at 3390 Woodrow Boulevard on July 14, 2019. He indicated that the residence was his mother's home. Four other individuals were also present at the residence, including Powell's mother, Powell's younger sister, G.S., and Robert Sherman. At the time of the shooting, Powell, G.S., and Sherman were seated on the front porch of the residence having a conversation.

{¶ 13} While on the porch, Powell received a phone call from his cousin and G.S.'s brother, Javon Parcher, who told Powell that Cherrywood Crips gang members were on their way to his location and advised Powell to leave the area. Powell informed

5.

G.S. and Sherman of the phone call, and then entered the residence to check on his mother. Shortly thereafter, Powell returned to the porch and resumed the conversation with G.S. and Sherman.

{¶ 14} Five minutes later, Powell saw a white sedan approaching, followed by a van. Powell recognized Brown (whom he called "Keno") as one of the two individuals in the white sedan. Additionally, Powell recognized that Allison (whom he called "Fredo") was in the passenger front seat of the van and appellant (whom he called "DooDoo") was in the passenger rear seat of the van. Subsequent to the shooting, Powell identified each of these three men in three separate photo arrays shown to him by law enforcement. He testified that he selected their photographs immediately upon seeing them and indicated that he was "a hundred percent sure" of his selection.

{¶ 15} According to Powell, the white sedan stopped on Manhattan Boulevard. At this point, Brown attempted to fire his handgun, but it did not initially fire. Powell testified that no shots were fired out of the back passenger seat of the white sedan. Meanwhile, several shots were fired from the van by Allison and appellant. According to Powell, appellant opened the sliding door on the van, fired several shots, and then slid the door closed before the van fled the scene. When the shooting stopped, Powell found G.S. lying on the floor of the porch. Thereafter, he called 911 to seek medical attention.

{¶ 16} Following Powell's testimony, the state called Javon Parcher to testify about his observation of events that transpired just prior to the shooting. Parcher, who was serving a prison sentence for burglary after violating the terms of his parole, testified

6.

that he had been in prison for ten years. While incarcerated, Parcher learned of a "Cherrywood and Geer beef."

{¶ 17} On the day of the shooting, Parcher was standing near the Greenbelt Place Apartments when a white Chevrolet sedan approached and Brown exited from the front passenger seat. Meanwhile, a green van also pulled up. According to Parcher, Allison was driving the van at the time. A conversation ensued, and Parcher testified that he overheard someone state, "we just caught Little Rob and Moota slippin'." This statement caught Parcher's attention because "Moota" was Powell's street name. Further, Parcher overheard someone state, "we just caught him slippin' out of the blue house on Manhattan," which Parcher recognized as his aunt's home.

{¶ 18} After the conversation concluded, a group of three individuals (including Allison) entered the green van, and the vehicles departed. Parcher testified that he did not see appellant among the group of individuals that entered the van. After the white sedan and green van left the area, Parcher called Powell to warn him that he was in danger.

{¶ 19} In addition to the foregoing witnesses, the state called several law enforcement officers during its case-in-chief. The state's first such witness was detective William Noon. Noon works in the Toledo Police Department's Gang Task Force, where he conducts surveillance and investigates gang-related criminal activity in the city of Toledo. After Noon explained his training and expertise, the state asked the trial court to

7.

certify him as an expert in the field of gang investigation. Without objection, Noon was so certified.

{¶ 20} According to Noon, at least 18 street gangs have been identified in Toledo. Admission to these gangs is obtained in several ways. Noon stated that people join gangs through their family, by fighting their way in, or through friendship with other gang members.

{¶ 21} Asked how he determined whether a particular individual is involved in a gang, Noon indicated that the Toledo Police Department developed certain criteria, which he explained as follows: "Our criteria's either self-admission, crimes that are being committed, who they're being committed with. Social media as in Facebook, Instagram or Snapchat or whatever it is. We also have confidential informants collecting different things that we put together." Noon went on to describe that a person's clothing and tattoos may be used to determine gang affiliation. He also indicated that gang members sometimes acquire and use "street names" when they enter a gang.

{¶ 22} Later in his testimony, Noon described the prevalence of rivalries among the criminal gangs in Toledo. Noon cited several examples of gang rivalries and characterized these rivalries as "fluid," meaning they were subject to change on a regular basis depending upon who is "beefing," or fighting. The extent to which the rivalry is active depends upon the level of violence taking place among the rivaling gangs. Noon stated that fighting usually begins when one gang member is shot by a member of a rivaling gang, and intensifies from that point.

8.

{¶ 23} According to Noon, one of the gangs located in Toledo is known as the Cherrywood Crips. The Cherrywood Crips are named after the Greenbelt Place Apartments, formerly known as the Cherrywood Apartments, which are located in the area occupied by the gang. Noon testified that the Cherrywood Crips can be identified by their blue clothing and their use of C-formation hand signs. Further, Noon has observed identifying tattoos on Cherrywood Crips with inscriptions such as "O'Blocc, One Ontario, 800 Woodz, Straight Eight, [and] Woodz Boyz."

{¶ 24} Throughout the course of his employment as a detective with the Toledo Police Department, Noon has observed several prosecutions of Cherrywood Crip members. At trial, he testified that these prosecutions were based upon various criminal charges including drug possession, drug trafficking, and firearm-related offenses.

{¶ 25} During his testimony, Noon revealed that the Cherrywood Crips have had several rivalries with other gangs over the years. In the summer of 2019, the Geer Gang Crips was one such rival gang. Noon was familiar with the rivalry, which began after the death of a Cherrywood Crip sometime prior to 2019. Following the death, another incident took place at Brown's home, in which a Geer Gang Crip fired shots at the residence. Noon testified that the rivalry between the Cherrywood Crips and the Geer Gang Crips was ongoing, as indicated by the occurrence of "multiple shootings."

{¶ 26} Noon testified that he is familiar with both Brown and appellant. According to Noon, Brown and appellant are associated with one another, and both men are members of the Cherrywood Crips gang. Noon provided extensive testimony

9.

concerning his prior interactions with, and surveillance of, Brown, also known by the street names of "TAG Keno" and "Keno Dash."  In short, Noon established Brown's gang involvement by referencing Brown's tattoos, social media postings, and prior acknowledgement of gang affiliation.  Moreover, the state introduced certified copies of three judgment entries relating to Brown's prior felony convictions for burglary in 2013, attempt to commit carrying a concealed weapon in 2016, and possession of cocaine in 2018.[2]  Noon testified that these convictions are indicative of prior gang participation, because criminal gangs sell narcotics to fund operations and commit acts of violence in order to establish their authority.  Noon further testified that Brown's conduct since those convictions suggests that he remains active in the Cherrywood Crips gang.

{¶ 27} Concerning appellant, Noon testified that members of the gang task force and appellant have come into contact with each other "several times" in the five-year period preceding the trial.  During those encounters, appellant was with other individuals that were known members of the Cherrywood Crips gang.  Moreover, according to Noon, appellant "has claimed membership to the Cherrywood Crips" to the detectives in the gang task force (including Noon) at various times in the past five years.

---

[2] The state also introduced judgment entries for Allison and two other known members of the Cherrywood Crips gang.  The offenses for which these individuals were convicted included aggravated trafficking in drugs, having weapons while under disability, attempted felonious assault, attempt to commit burglary, attempted possession of heroin, and escape.

{¶ 28} In order to establish appellant's affiliation with the Cherrywood Crips gang, the state introduced images of appellant's tattoos. One of the tattoos is located on appellant's chest and states "King Reese 800%." Noon testified that the number 800 is a reference to the 800 block in Toledo, the location of the Greenbelt Place Apartments. Another tattoo is located on appellant's right bicep and states "OBLOCC." Noon explained that the spelling of this tattoo is significant, because Crips gang members "don't put the 'k' at the end of the block * * * because it would be Crip killer." Noon went on to indicate that the 'O' stands for Ontario "which is in the 800 block of Ontario which is also in the Cherrywood Apartments, Greenbelt Place Apartments." Further, Noon stated that the placement of the tattoo on the right arm is meaningful, because Crips put their tattoos on the right arm and bloods put their tattoos on the left arm. A third tattoo is located on appellant's right inner arm and states "R.I.H." Noon stated that this is an acronym for the phrase "rest in heaven," and noted that the dots between the letters were shaped as a six-point star, which is used by the Crips (Bloods use a five-point star).

{¶ 29} Later in his testimony, Noon discussed his review of the public portion of appellant's Facebook profile. Based upon the pictures of appellant that were uploaded to the profile, Noon determined that the profile belonged to appellant even though it was listed under the name "Illy Erving." Screenshots of select posts from appellant's Facebook profile were admitted into evidence without objection. In one post from July 29, 2019, appellant wrote: "At this point bitch it's fucc you if you ain't wit me on 800 Blocc." In another post, dated July 12, 2019, appellant uploaded a photograph of himself

11.

standing in the parking lot of the Greenbelt Place Apartments and captioned the photograph, "Oblocc certified." These references to "Oblocc" and the "800 Blocc" are, according to Noon, references to the location of the Greenbelt Place Apartments and the Cherrywood Crips gang territory. In another photograph that was posted to a different individual's Facebook profile on July 18, 2019, appellant is depicted with his hands in the shape of the Cherrywood Crips gang sign. Another photograph that was uploaded to a Facebook profile belonging to Jamele Hughes (a known Cherrywood Crips gang member) on July 10, 2019, depicts appellant and Hughes with a caption that reads: "Happy CDay To My Brother Illy Erving." Noon explained that "CDay" is short for Crip day.

{¶ 30} After Noon finished his testimony concerning the material he found on Facebook, the state sought to introduce a certified judgment entry revealing that appellant was sentenced to three years of community control after pleading no contest to two counts of having weapons while under disability on November 18, 2019. These charges stemmed from appellant's unlawful possession of firearms on July 8, 2019 (six days prior to the shooting in this case), and August 13, 2019. Appellant's defense counsel objected to the admission of the judgment entry, arguing that there was no indication from the entry that the conduct for which appellant was found guilty promoted or furthered the criminal enterprise of gang activity. Ultimately, the trial court overruled the objection and admitted the judgment entry.

12.

{¶ 31} After reviewing the judgment entry, Noon noted that "[i]t is very common to find that gang members are found guilty of weapons offenses." Noon stated that firearms are used by gangs, including the Cherrywood Crips, for retaliation, protection, and influence. Based upon the fact that appellant's criminal conviction was recent (less than one year prior to trial), Noon surmised that appellant remained active with the Cherrywood Crips gang.

{¶ 32} In order to establish appellant's connection to the white sedan that was seen by several eyewitnesses to the drive-by shooting, the state called Nicholas Estavenic. Estavenic works as an officer in the Toledo Police Department's special intelligence group. On July 14, 2019, Estavenic was asked to set up surveillance on a white Chevrolet Sonic sedan that law enforcement believed was used in the shooting at issue in this case. The next day, Estavenic located the vehicle in a parking lot on Erie Street in Toledo. Thereafter, Estavenic and four other officers began watching the vehicle from different positions.

{¶ 33} During his surveillance, Estavenic saw one female exit the vehicle. Upon her return to the vehicle, the female was accompanied by a male companion. Photographs of the two individuals were taken at the time and admitted into evidence at trial. Estavenic authenticated the photographs and identified the two individuals depicted therein as appellant and appellant's ex-girlfriend, Mariah Livingston.

{¶ 34} Livingston testified after Estavenic. She acknowledged that she was formerly in a relationship with appellant. Indeed, appellant and Livingston lived together

13.

at the time of the shooting. On the day of the shooting, Livingston allowed appellant to borrow her vehicle, a white Chevrolet Sonic sedan that she received as a loaner vehicle from a local dealer. Livingston testified that appellant borrowed the vehicle at approximately 2:30 p.m. Appellant then left the residence and did not return until approximately 8 p.m. Livingston had no knowledge of how appellant used her car during this time period.

{¶ 35} As its final witness, the state called detective Paul Marchyok of the Toledo Police Department. Marchyok was the lead homicide detective assigned to this case. During his investigation, Marchyok obtained a surveillance video from a residence located near the scene of the shooting. The video depicted two vehicles, a "white sedan and a dark colored minivan," that matched the eyewitness descriptions of the vehicles used in the shooting. According to Marchyok, the van was damaged and appeared to be "very distinctive." Photographs of the minivan reveal body damage to the passenger side of the van, as well as a missing hubcap on the front passenger wheel.

{¶ 36} Marchyok proceeded to disseminate still images of the vehicles from the video to other law enforcement agencies for assistance in locating and identifying the vehicles. He testified that he had received information that Powell and Sherman were members of the Geer Gang Crips street gang, which he knew to be involved in a violent gang feud with the Cherrywood Crips.

{¶ 37} After disseminating the still images, Marchyok was contacted by law enforcement officers who informed him that the van "belonged to somebody in * * * the

14.

Greenbelt Place Apartments." Moreover, officers from the gun crimes unit of the Toledo Police Department located a white Chevrolet Sonic that matched the image. Subsequently, Marchyok dispatched a surveillance unit to observe the white Sonic and the minivan. During the ensuing surveillance, officers took "several photographs of known Cherrywood gang members * * * going in and out of [the van] and driving that vehicle." However, only appellant and Livingston were observed using the white Sonic.

{¶ 38} At the conclusion of Marchyok's testimony, the state rested. Appellant and Brown each moved the trial court for acquittals under Crim.R. 29, and the trial court denied the motions. The court then inquired as to whether appellant or Brown intended to present any evidence. Defense counsel for both appellant and Brown informed the court that they were not calling any witnesses. After the trial court ensured that neither appellant nor Brown wished to take the stand, each party rested. Thereafter, the matter proceeded to closing arguments.

{¶ 39} Upon consideration of the evidence introduced at trial and the arguments of the parties, the trial court found appellant guilty of participating in a criminal gang, but not guilty of the remaining charges and specifications contained in the indictment. On June 11, 2020, the trial court sentenced appellant to an indefinite prison term of five to seven and one-half years in prison. Four weeks later, on July 9, 2020, appellant filed his timely notice of appeal.

## B. Assignments of Error

{¶ 40} On appeal, appellant assigns the following errors for our review:

I.  The evidence presented at trial was insufficient to support a conviction for Participating in a Criminal Gang.

II.  The conviction for Participat[ing] in a Criminal Gang is against the manifest weight of the evidence.

## II.  Analysis

### A.  The state's evidence was sufficient to prove the elements of participating in a criminal gang.

{¶ 41} In appellant's first assignment of error, he argues that the evidence presented by the state at trial was insufficient to support his conviction for participating in a criminal gang.

{¶ 42} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 43} Appellant was convicted of participating in a criminal gang during the five-year period from September 26, 2014 through September 26, 2019, in violation of R.C. 2923.42(A), which provides:

No person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal

16.

gang activity, shall purposely promote, further, or assist any criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, or shall purposely commit or engage in any act that constitutes criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code.

{¶ 44} Under this statutory section, the state is required to prove four elements, which we have identified as

(1) the existence of a criminal gang, (2) appellant's active participation in the gang, (3) appellant's knowledge that the gang engages in or has engaged in a pattern of criminal gang activity, and (4) appellant's purposeful promotion, furtherance, or assistance of, or commission of or engagement in, any criminal conduct.

*State v. Roberson*, 6th Dist. Lucas No. L-16-1131, 2017-Ohio-4339, ¶ 72. We will address each of these elements in turn.

### i. Existence of a Criminal Gang

{¶ 45} At trial in this case, the state established that the Cherrywood Crips gang is a "criminal gang." Under R.C. 2923.41(A), a criminal gang is defined as an ongoing organization, consisting of three or more persons who engage in or have engaged in a pattern of criminal gang activity, which has as one of its primary activities the commission of one or more felonies and has a common name or common identifying signs, symbols, or colors.

{¶ 46} The state introduced testimony at trial to establish that the Cherrywood Crips gang is a criminal gang in the city of Toledo that consists of more than three individuals. Noon testified that the Cherrywood Crips can be identified by their use of blue clothing, C-formation hand signs, and identifying tattoos. Noon also indicated that he has personally observed several prosecutions of Cherrywood Crips members. At trial, he testified that these prosecutions were based upon various criminal charges including drug possession, drug trafficking, and firearm-related offenses. Later on in the trial, the state introduced sentencing entries evidencing prior felony convictions for Brown, appellant, Allison, and two other Cherrywood Crips gang members.

{¶ 47} On appeal, appellant does not dispute that the Cherrywood Crips organization is a criminal gang. In light of the foregoing evidence, we find that the state introduced sufficient evidence to prove that the Cherrywoods Crips gang is a "criminal gang" under R.C. 2923.41(A).

### ii. Active Participation

{¶ 48} While appellant does not dispute that the state established the first element under R.C. 2923.42 (the existence of a criminal gang element), he does challenge the sufficiency of the state's evidence as to the remaining three elements. First, appellant argues that the state failed to introduce evidence to prove that he is an active participant in the Cherrywood Crips gang.

{¶ 49} Notably, R.C. 2923.42 contains the phrase "actively participates," but does not define active participation. *Roberson* at ¶ 76. Nonetheless, we have explained that

18.

"the active participation element of the criminal gang statute requires the state [to] demonstrate that appellant actually – not just nominally – took part in the criminal gang." *State v. Smith*, 6th Dist. Lucas No. L-15-1027, 2017-Ohio-776, ¶ 38. "Actual participation requires that the appellant perform 'some role to benefit the gang.'" *Roberson* at ¶ 76, quoting *Smith* at ¶ 39.

{¶ 50} Appellant asserts that the state's evidence did not establish that he is an active member of the Cherrywood Crips, but merely established that he "has associates who are members of the Cherrywood Crips." We examined a similar argument in *Roberson*, where the defendant, Ronald Roberson, was indicted on one count of domestic violence, two counts of aggravated burglary, one count of rape, one count of aggravated robbery, and one count of participating in a criminal gang. *Id*. at ¶ 2. Following a jury trial, Roberson was found guilty of all counts and sentenced to 27 years and 11 months in prison. *Id.* at ¶ 35.

{¶ 51} On appeal, we reversed Roberson's conviction for participating in a criminal gang after we found that the state did not introduce sufficient evidence to prove that he was an active participant in the Bee Hive gang from January 1, 2010 through December 18, 2015, the period set forth in the indictment. The evidence relied upon by the state in *Roberson* consisted of testimony from Noon and Facebook photographs depicting Roberson with gang-related tattoos displaying the Bee Hive hand sign. *Id*. at ¶ 77. The photographs were posted to Facebook in 2013, 2015, and an unknown year, but there was no evidence to demonstrate when they were taken. *Id*.

19.

{¶ 52} Noon's testimony in *Roberson* revealed that Roberson admitted his membership in the Bee Hive gang in 2012. *Id.* However, Roberson was not a focus of law enforcement investigation at any point after the end of 2012. *Id.* Further, Roberson testified that he was a *former* Bee Hive gang member, but insisted that he had not been active in the gang in years. *Id*. at ¶ 78.

{¶ 53} Upon review of the foregoing evidence, we found that the state's evidence merely demonstrated that Roberson was passively involved in the Bee Hive gang – the evidence did not demonstrate that Roberson "did anything to benefit the Bee Hive gang." *Id.* at ¶ 81. We went on to state: "Simply put, the state failed to connect Roberson's self-affiliation with the Bee Hive gang (i.e., his tattoos, use of the gang sign, and admission to Detective Noon in 2012) to the aggravated burglary of C.G. or any other activity * * * that could somehow benefit the gang." *Id.* In so stating, we rejected the state's argument that a juror could draw a reasonable inference that Roberson arranged for Bee Hive gang members to burglarize C.G.'s home based upon Noon's testimony that Bee Hive gang members engage in property crimes and C.G.'s statement that she heard unfamiliar voices in her home after Roberson left and before she discovered that her property was stolen. *Id.* We rejected this inference after noting that "there was no additional evidence from which the jury could infer that the unidentified people were Bee Hive members." *Id.*

{¶ 54} In support of our determination that the state's evidence was insufficient to prove active participation in *Roberson*, we cited several previous decisions of this court in which we "consistently required more evidence of active participation than the state

20.

presented against Roberson." *Id*. at ¶ 82, citing *Smith*, 2017-Ohio-776, at ¶ 41–44 (conviction for participating in a criminal gang upheld based on observation of defendant with active gang members, photograph of defendant flashing a gang sign, photograph of defendant's birthday cake decorated with gang symbols, evidence that defendant sold drugs and that the gang supported itself through drug sales, and evidence that defendant committed a drive-by shooting with members of the gang); *State v. Nelson*, 6th Dist. Lucas No. L-15-1190, 2016-Ohio-7115, ¶ 41-42 (conviction upheld based on defendant's recorded admission of participating in the gang and evidence that the murder he participated in was in retaliation for a drive-by shooting by a rival gang); *State v. Allen*, 6th Dist. Lucas No. L-14-1078, 2016-Ohio-2742, ¶ 9–10 (conviction upheld based on defendant's participation in recent gang fight, defendant's prior participation in a felony with another gang member, defendant's gang tattoo, tribute to a dead gang member on defendant's Facebook page, photograph of defendant with a gang member who was flashing a gang sign, and evidence that defendant murdered a rival gang member in retaliation for his brother's death). We explained that the defendants in each of the cited cases engaged in conduct that furthered some interest of the gang, including selling drugs and murdering rival gang members. *Id*. at ¶ 83.

{¶ 55} By contrast, we found that the state's evidence in *Roberson*, consisting of Roberson's tattoos, his admitted socialization with gang members and admission of prior gang membership, and the photograph of him using a Bee Hive hand sign, merely established Roberson's *association* with the Bee Hive gang. Such evidence failed to

prove active participation in the activities of the gang, and therefore it was insufficient to establish the second element of participating in a criminal gang under R.C. 2923.42. *Id.*

{¶ 56} In the present case, the evidence introduced by the state to establish appellant's active participation in the Cherrywood Crips gang was more extensive than that introduced to establish active participation in *Roberson*. Specifically, Noon testified that appellant was involved in several encounters with gang task force officers during the five-year time period set forth in the indictment. Officers observed appellant associating with other known Cherrywood Crips gang members during these encounters. Noon also testified that appellant acknowledged his membership in the Cherrywood Crips gang at various times in the past five years.

{¶ 57} Images of appellant's tattoos, which included language and symbolism associated with the Cherrywood Crips, provided further evidence of appellant's gang affiliation. Appellant's Facebook profile added to the state's evidence linking appellant and the Cherrywood Crips. In one such post, dated July 29, 2019, appellant wrote: "At this point bitch it's fucc you if you ain't wit me on 800 Blocc." In another post, dated July 12, 2019, appellant uploaded a photograph of himself standing in the parking lot of the Greenbelt Place Apartments and captioned the photograph, "Oblocc certified." According to Noon, "800 Blocc" and "Oblocc" were references to the location of the Greenbelt Place Apartments and the Cherrywood Crips gang territory. Other Facebook posts from July 2019 revealed appellant associating with other known Cherrywood Crips

22.

members, depicted appellant using the Cherrywood Crips hand sign, and included a comment directed toward appellant wishing him a "happy CDay," or Crip day.

{¶ 58} Unlike the evidence introduced in *Roberson*, the state's evidence here established that appellant did more than merely associate with a criminal gang in the past. Appellant's gang-related encounters with law enforcement officers, acknowledgement of gang membership, and incriminating social media posts all occurred near in time to the drive-by shooting on July 14, 2019, and well within the five-year period set forth in the indictment.

{¶ 59} Moreover, a judgment entry introduced by the state revealed that appellant was convicted of two counts of having weapons while under disability based upon conduct that occurred in July and August 2019. Noon testified that firearms-related offenses were commonly associated with gang activity, and he stated that the Cherrywood Crips gang uses firearms for retaliation, protection, and influence. Evidence of this nature, which establishes *active* criminal conduct associated with gang activity during the five-year time period associated with the charge of participating in a criminal gang, was lacking in *Roberson*.

{¶ 60} In addition to appellant's prior criminal gang-related activity established by the judgment entry, the state introduced testimony that, if believed, would lead a reasonable factfinder to conclude that appellant was an active participant in the drive-by shooting on July 14, 2019. Powell, as an eyewitness to the drive-by shooting, testified that he saw appellant slide open the rear passenger door of the green van and begin

23.

shooting toward his location on the front porch of the Woodrow Boulevard residence. After the shooting, Powell identified appellant during a photo array and indicated at trial that he was "a hundred percent sure" of his identification. Other eyewitnesses provided conflicting testimony as to whether there were any shooters firing from the rear passenger seat of the van, and the sliding door was found to be inoperable after the van was impounded by law enforcement. This conflicting evidence was before the jury at trial, and our examination of the sufficiency of the state's evidence involves a limited review that "does not intrude on the jury's role 'to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Musacchio v. United States*, 577 U.S. 237, 136 S.Ct. 709, 715, 193 L.Ed.2d 639 (2016), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 61} Even if appellant was not present during the drive-by shooting, the state introduced evidence to demonstrate appellant's role in providing the white Chevrolet Sonic that was used (along with the van) to facilitate the shooting. At trial, Livingston testified that she allowed appellant to borrow the Sonic at around 2:30 p.m. on the day of the shooting. Appellant did not return the vehicle until approximately 8 p.m., several hours after the fatal drive-by shooting. Subsequent to the shooting, Estavenic photographed appellant and Livingston together as they approached and entered the white Sonic.

{¶ 62} In light of the foregoing, we find that the state's evidence was sufficient to prove that appellant was an active participant in the Cherrywood Crips criminal gang

24.

during the five-year period contained in the indictment. The state offered evidence to establish appellant's historical gang involvement and also provided evidence to prove that appellant participated in the drive-by shooting as one of the shooters and/or acted as an accomplice by providing one of the two vehicles used to facilitate the shooting.

### iii. Knowledge of the gang's pattern of criminal gang activity

Having found that the state's evidence was sufficient to prove the first two elements of R.C. 2923.42(A), we turn now to the third element involving appellant's knowledge that the Cherrywood Crips gang engages in or has engaged in a pattern of criminal gang activity.

Under R.C. 2923.41(B)(1), a "pattern of criminal gang activity" means that "persons in the criminal gang have committed, attempted to commit, conspired to commit, been complicitors in the commission of, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of two or more" specified offenses. These specified offenses include, inter alia, felonies or acts committed by a juvenile that would be felonies if committed by an adult. R.C. 2923.41(B)(1)(a). The "pattern of criminal gang activity" is established when at least one of the two or more specified offenses is a felony, at least one of the two or more specified offenses occurs on or after January 1, 1999, the most recent of the specified offenses occurs within five years of another of the specified offenses, and the specified offenses are committed on separate occasions by two or more persons. R.C. 2923.41(B)(2).

25.

As noted above, the state's evidence included several certified judgment entries involving appellant, Brown, Allison, and two other individuals, Jajuan Lawrence and Antwione Goetz, all of whom were known members of the Cherrywood Crips gang. These judgment entries contain convictions for specified felony offenses that occurred after January 1, 1999, and were committed by separate individuals on separate occasions.

Appellant committed the most recent of the specified felony offenses, having weapons while under disability, on August 13, 2019. Two months prior to that offense, on June 14, 2019, Allison also committed, and was subsequently convicted for, the specified felony offense of having weapons while under disability. Additional judgment entries evidencing the commission of specified felony offenses within the five-year period preceding the most recent specified felony offense were admitted into the record. These entries reveal that Allison committed four additional specified felony offenses, Brown committed two specified felony offenses, and Lawrence and Goetz each committed one specified felony offense.

The above-referenced judgment entries clearly establish a "pattern of criminal gang activity" under R.C. 2923.41(B). Further, the offenses reflected in the judgment entries were committed during the time period in which appellant was an active participant in the Cherrywood Crips gang, and thus it is reasonable to infer that he knew of the gang's criminal activity and the felony convictions that flowed therefrom (including his own). Therefore, we find that the state introduced sufficient evidence to

26.

prove the third element of R.C. 2923.42(A), namely appellant's knowledge that the Cherrywood Crips gang engages in or has engaged in a pattern of criminal gang activity.

### iv. Purposeful promotion, furtherance, or assistance of, or commission of or engagement in, any criminal conduct

{¶ 63} Finally, we must consider whether the state introduced sufficient evidence to establish the fourth element of R.C. 2923.42(A) involving appellant's purposeful promotion, furtherance, or assistance of, or commission of or engagement in, any criminal conduct. Under R.C. 2923.41(C), "criminal conduct" includes those offenses that are specified felony offenses under R.C. 2923.41(B)(1).

{¶ 64} In examining the sufficiency of the state's evidence as to the active participation element of R.C. 2923.42(A), we noted Powell's confident eyewitness testimony that appellant was one of the shooters involved in the drive-by shooting on July 14, 2019. If believed, this evidence would certainly permit the trier-of-fact to conclude that appellant purposefully promoted, furthered, assisted, or committed criminal conduct.

{¶ 65} Additionally, the testimony provided by Livingston and Estavenic established that appellant borrowed Livingston's Chevrolet Sonic and did not return it until several hours after the shooting in which it was used by a group of Cherrywood Crips gang members. Since appellant had exclusive control over the Sonic during this time, the trier-of-fact could reasonably infer that he provided the vehicle to the group of Cherrywood Crips gang members in order to assist in the commission of the gang-related, retaliatory drive-by shooting.

27.

{¶ 66} Upon consideration, we find that the foregoing evidence is sufficient to prove appellant's purposeful promotion, furtherance, assistance of, or commission of, criminal conduct. Having also found the state's evidence sufficient as to the other three elements of participating in a criminal gang under R.C. 2923.42(A), we find no merit to appellant's sufficiency argument on appeal. Accordingly, appellant's first assignment of error is not well-taken.

### B. Manifest Weight of the Evidence

{¶ 67} In his second assignment of error, appellant argues that his conviction for participating in a criminal gang is against the manifest weight of the evidence presented at trial.

{¶ 68} When reviewing a manifest weight claim, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). That is, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. *Id.* Our role is to determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* We reverse a conviction on manifest weight grounds for only the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 387.

{¶ 69} In his brief, appellant argues that the state's evidence against him merely showed that he associated with gang members and borrowed his girlfriend's vehicle. Because the state failed to place him inside Livingston's Chevrolet Sonic at the time of

28.

the shooting and further failed to explain how the vehicle came to be involved in the shooting without him inside, appellant contends that his conviction for participating in a criminal gang "amounts to guilty by association." Having reviewed the record in its entirety, we disagree.

{¶ 70} At trial, the state introduced extensive evidence, much of which is outlined above, to establish that several members of the Cherrywood Crips gang carried out a drive-by shooting at the Woodrow Boulevard residence on July 14, 2019. According to the state's unrefuted evidence, this shooting was in retaliation for a prior shooting for which the Geer Gang Crips, a rival gang, was responsible. While there is conflicting evidence as to appellant's presence at the scene of the drive-by shooting and his active involvement therein as a shooter, there is no such conflict concerning the fact that appellant borrowed Livingston's vehicle only a short time prior to its use in the drive-by shooting. This evidence, along with the evidence of appellant's prior conviction for having weapons under disability and Noon's testimony that criminal gangs promote and protect themselves using firearms, leads us to conclude that this is not the exceptional case in which the evidence weighs heavily against the conviction.

{¶ 71} Simply put, evidence of appellant's *active involvement* in the Cherrywood Crips criminal gang, not his mere association with gang members, supports the trial court's verdict in this case. The verdict is not against the manifest weight of the evidence. Accordingly, appellant's second assignment of error is not well-taken.

29.

### III.  Conclusion

{¶ 72} In light of the foregoing, the judgment of the Lucas County Court of Common Pleas is affirmed.  The costs of this appeal are assessed to appellant under App.R. 24.

Judgment affirmed.

Christine E. Mayle, J.
_____

Gene A. Zmuda, P.J.
JUDGE

Myron C. Duhart, J.
_____
CONCUR.
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.