[Cite as *State v. Evans*, 2024-Ohio-5731.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                         Court of Appeals No.  L-23-1247
                                                                              L-23-1248

   Appellee                          Trial Court No.  CR0202202195
                                                                              CR0202202996
v.

David Evans                                          **DECISION AND JUDGMENT**

   Appellant                          Decided:  December 6, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, David Evans, appeals the

October 2, 2023 judgment of the Lucas County Court of Common Pleas, convicting him

of two counts of murder and one count of felonious assault, with firearm and discharge

firearms specifications, discharge of a firearm on or near prohibited premises, improperly

handling of a firearm, and participating in a criminal gang. For the following reasons, we affirm the trial court judgment.

## I. Background

{¶ 2} David Evans, Chicha Harris, and Ronald Richardson, II, were indicted in Lucas County case No. CR22-2195 on charges of murder, a violation of R.C. 2903.02(A) and 2929.02, along with specifications under R.C. 2941.145(A), (B), (C), and (F), and 2941.146(A), (B), and (D), and as to Harris only, an additional specification under R.C. 2941.149 (Count 1); murder, a violation of R.C. 2903.02(B) and 2929.02, along with specifications under R.C. 2941.145(A), (B), (C), and (F), and 2941.146(A), (B), and (D), and as to Harris only, an additional specification under R.C. 2941.149 (Count 2); felonious assault, a violation of R.C. 2903.11(A)(2) and (D), a first-degree felony, along with specifications under R.C. 2941.145(A), (B), (C), and (F), and 2941.146(A), (B), and (D), and as to Harris only, an additional specification under R.C. 2941.149 (Count 3); discharge of a firearm on or near prohibited premises, a violation of R.C. 2923.162(A)(3) and (C)(4) (Count 4); and improperly handling of a firearm, a violation of R.C. 2923.16(B) and (I) (Count 4). They were also charged in Lucas County case No. CR22-2996 with participating in a criminal gang, a violation of R.C. 2923.42, a second-degree felony.

{¶ 3} Richardson entered a plea of guilty under *North Carolina v. Alford* to the lesser-included offense of involuntary manslaughter with three-year and five-year gun specifications, and participating in a criminal gang. The charges against Evans and

2.

Harris were tried together to a jury beginning September 17, 2023. The following evidence was presented at trial.

### A. G.M. is murdered.

{¶ 4} On January 16, 2022, at 8:00 p.m. and 8:04 p.m., two 9-1-1 callers reported seeing a silver Chevy Malibu, riddled with bullet holes, stopped at the intersection of Perrysburg-Holland and Holland-Sylvania Roads. Lucas County Sherriff's Deputy Sergeant Justyn McKnett was the first officer to arrive on the scene. He opened the door and found G.M. slumped in the driver's seat, unresponsive. He had been shot. Efforts to resuscitate him were unsuccessful.

{¶ 5} The Lucas County Coroner determined that G.M. died of a gunshot wound that pierced his left arm and entered his chest; the shots were fired left to right from the driver's side of the vehicle and it was surmised that G.M.'s left arm was on the steering wheel when he was shot. He had also been shot in the left hip. The car had been struck by numerous bullets.

{¶ 6} Testing of bullets and casings found at the scene, retrieved from the vehicle, and extracted from G.M.'s body revealed that 31 shots had been fired from three different guns. Bullet fragments and casings for nine millimeter, .45 caliber, and .40 caliber firearms were found. Eleven shell casings, one bullet recovered from the scene, and one of the bullets extracted from G.M.'s body at autopsy were fired from a .40 caliber Glock. A projectile fired from a .45 caliber firearm was extracted from G.M.'s spine. And projectiles fired from a nine millimeter firearm were recovered from the headrest and ashtray of G.M.'s vehicle.

3.

**B. Police narrow in on a blue Dodge Charger.**

{¶ 7} A couple saw a report of the shooting on the news and realized that they had been in the vicinity of the shooting around the time it occurred. They contacted police and notified them that they had seen possibly a white man in a dark blue Dodge Charger with a spoiler run a stoplight on Airport Highway driving toward Holland-Sylvania Road; Evans, Harris, and Richardson are Black. The couple was driving from Spring Meadows Shopping Center toward their apartment on Perrysburg-Holland Road. When they got to the intersection of Perrysburg-Holland and Holland-Sylvania Roads, they saw the Charger again and heard what they thought was a car backfiring; they did not hear what would account for 31 shots.

{¶ 8} Shortly before responding to the scene, while attending to a vandalism report at nearby Valley Stream Apartments, Sergeant McKnett and Sergeant Brandon Winkleman heard what they believed were firecrackers.

{¶ 9} Uneaten Burger King food found in G.M.'s car led officers to the Burger King at Spring Meadows Shopping Center. They pulled surveillance video from the Burger King, located on Airport Highway, Virtual PC, located in Spring Meadows Shopping Center behind the Burger King, and the Wolf Creek YMCA, located on Holland-Sylvania Road. Those video recordings showed that G.M. ordered at Burger King's drive-through window at 7:41 p.m. While G.M. was in the drive-through line, a blue Dodge Charger pulled into the parking lot behind Burger King, parked for two minutes, then left. Several minutes later, the YMCA surveillance camera recorded what appeared to be the Malibu being followed by what appeared to be the Charger.

4.

Surveillance video from St. Joan of Arc school, on Heatherdowns Boulevard, was also reviewed, however, the blue Charger was not visible in that footage.

{¶ 10} After the witnesses reported seeing a blue Dodge Charger, Lucas County Sherrif's Detective Williams Scroggs issued a BOLO—a be on the lookout—so that other law enforcement would know that he was interested in information relating to a car with that description. He learned that a blue Dodge Charger was of interest to Toledo Police in an unrelated incident and had been sent to a TPD storage facility.

### C. DNA in the blue Dodge Charger lead police to suspects.

{¶ 11} In the early morning hours of January 21, 2022, Toledo police found a blue Dodge Charger abandoned at the corner of Delaware and Glenwood Avenue. They impounded the car and obtained a search warrant, seeking evidence of who had occupied the vehicle. They collected and tested DNA evidence, which indicated that Harris, Shomari Hannah, and Christopher Jones had been in the vehicle at some point.

{¶ 12} The Toledo Police also gathered surveillance video from Moody Manor Apartments from January 20, 2022. The surveillance video showed that approximately six hours before the vehicle was found, the blue Charger pulled into the Moody Manor parking lot. A group of men exited (and eventually reentered) the vehicle. While they were outside of the vehicle, two men posed for photographs in front of a tree—the video showed flashes and lights from a cell phone. Police found a picture on social media of Evans standing next to Harris in front of a tree at Moody Manor, both holding firearms. So although Evans's DNA was not found on items tested from the vehicle, the detective concluded that Evans had also occupied the Charger.

5.

### D. A possible gang connection is discovered.

{¶ 13} Detective Scroggs obtained search warrants for G.M.'s home, cell phone, and social media accounts, and he talked to family members, friends, and co-workers. He found nothing out of the ordinary that would have made G.M. a target of a shooting. A confidential source did report, however, that G.M.'s immediate next-door neighbor, W.P., was a member of the Body Up gang.

{¶ 14} The Body Up gang and Moody Manor Bloods were known to have an ongoing feud with Ro Gang Bloods, another Toledo gang with approximately 15 to 20 members, and most of the city's other Bloods-affiliated gangs. Body Up uses a hand sign, performed by holding the ring finger down so that the index and middle fingers stay up together to form the number "2" and the pinky stays up to form the number "1." The "2" and "1" signify 2100 Kent—the location of Moody Manor. Rival gangs sometimes show disrespect to Body Up by pointing the hand signal down instead of up. Ro Gang members identify with the word "reckless," the letters "RR," and the number "1023," a tribute to a friend (Romear) who died on October 23, 2018, after whom the gang was named.

6.

### E. Evans is believed to belong to Ro Gang.

{¶ 15} Toledo Police Detective Nicholas Bocik is a detective in the TPD's gang task force. Based on their known associations, general intelligence he has gathered or accessed over his almost 12 years investigating gang activity in Toledo, monitoring of social media activity, and information obtained through search warrants and from confidential informants, Detective Bocik concluded that Evans, Harris, and Richardson are members of Ro Gang.

{¶ 16} A recording of a four-way video call was also produced in response to the search warrant. Evans and Harris participated in that call. They talked about firearms, including an XD, a Glock, and a Draco, and one of the participants held a gun during the video call.

{¶ 17} Music videos were played for the jury. One, called Blow that Smoke, features Evans, Harris, and others. Three people in the video are wearing t-shirts with the word "reckless" written on them—i.e., the word Ro Gang rallies around; Detective Bocik said that Evans has a tattoo of the same image. In the song, Evans sings the lyrics "catch an op and hit they block and leave them on the flow," "RG shit," and "last [racial slur] smoke on Ro got put up in a box," which Bocik interpreted, respectively, as a threat, a reference to Ro Gang, and a statement that the last person who spoke ill of Ro Gang was killed.

{¶ 18} In another music video Harris performs a song called Switches and Dracs, in which Evans appeared. The video features an image of a ghost, which Detective Bocik said symbolizes a deceased member of the Moody Manor Bloods.

7.

{¶ 19} Detective Bocik testified that Richardson made admissions associating himself to Ro Gang, and photos were found on his phone connecting him to Ro Gang, Evans, and other identified members of Ro Gang.

{¶ 20} Detective Bocik testified that gang members engage together in committing crimes including homicide, felonious assault, drug trafficking, and robberies. Evans, Harris, and Richardson all have prior convictions or juvenile adjudications for offenses that gang members commonly commit. Evans has a criminal history that includes convictions of attempted improper handling of a firearm in a motor vehicle and failure to comply with a signal of a police officer. Richardson entered an *Alford* plea in this case to involuntary manslaughter and participating in a criminal gang. And Harris has a criminal history that includes three separate juvenile adjudications for aggravated robbery and adult felony convictions for trafficking in fentanyl, attempt to commit murder, felonious assault, and attempted felonious assault—the violent offenses were committed with other gang members.

### F. Cellular data places the suspects (and the car) near the incident.

{¶ 21} After obtaining the VIN for the Charger, Detective Scroggs obtained a warrant for the cellular signals emitted by the vehicle's infotainment system. He submitted the data he obtained to BCI for mapping. Cell site analysis was also performed of Evans and Harris's cell phones, and text messages were extracted from Richardson's phone.

{¶ 22} At 4:27 p.m. on January 16, 2022, Richardson created a video of himself with Evans in the backseat of a Charger. Richardson had a Glock pistol and a Draco

8.

firearm and Evans had a pistol. At 6:22 p.m.—approximately 90 minutes before the shooting—someone (possibly a person named K.J.) texted Richardson and asked where he was. He responded "I'm in a car with Chi." The State's position was that "Chi" is Chicha Harris. At 7:18 p.m., Richardson received another text inquiring as to his whereabouts. At 7:19 p.m., he responded "Blood shit."

{¶ 23} Beth Dailey, a criminal intelligence analyst with Ohio's Bureau of Criminal Investigations, reviewed cell location information for January 16, 2022, from 4:00 to 4:45 and 7:00-8:30 p.m. She testified that from 4:00 to 4:10 p.m., the Charger and Evans and Harris's cell phones frequently used the same cell towers within a short time of each other. Between 7:00 and 7:30 p.m., the Charger and Evans' and Harris's phones used the same cell tower near Airport Highway and I-475—where the victim's apartment was located. A Cellebrite report showed that Richardson's cell phone was in the same vicinity at 7:28 p.m. The Charger and Evans's phone also used cell towers in the area where the Charger was visible in the surveillance videos. And after witnesses saw the Charger turn onto Perrysburg-Holland Road, cell tower location data showed that Evans's phone was near Heatherdowns Boulevard.

{¶ 24} From 7:50 to 7:55 p.m., Evans and Harris's phones were in the same general location along I-475 after the U.S. 23 split, and Evans's phone communicated with a cell tower once along I-475 and the U.S. 23 split. Evans and Harris's phones were in the same general area after the shooting.

{¶ 25} There were many caveats and limitations noted with respect to using this data to determine the suspects' location. Some towers may not service all cellular

9.

carriers, for instance. Also, the best signal is not always the cell tower closest to the location of the device and analysts are not provided information concerning how far the signal of a particular cell tower reaches. The data cannot pinpoint a user's exact location, but it can help identify a general location. Here that information was consistent with Evans, Harris, and Richardson being in the vicinity of one another and in the vicinity of the Charger around the time of the shooting. The State's position was that the defendants staked out the victim's location in the late afternoon, then followed him in the early evening, culminating in the shooting.

### G. The suspects have connections to the guns.

{¶ 26} Police recovered one of the guns used in the shooting. A Glock model 23 Gen5 .40 caliber pistol was recovered on February 8, 2022. It was determined that 11 casings found at the scene had been fired from this weapon. Richardson appeared in a video dated January 5, 2022, holding this very gun—the serial number was visible in the video. Shortly after the shooting, Harris instant messaged with someone concerning the sale of a Draco and a Glock. Detective Bocik testified that criminals often sell firearms after they have been used to commit a crime.

### H. The jury convicts Evans and Harris.

{¶ 27} The jury found Evans and Harris guilty of all counts. On October 2, 2023, the trial court found that in Lucas County case No. CR22-2195, Counts 2 and 3 are allied offenses of similar import that merge with Count 1 for sentencing purposes. The State elected to have Evans sentenced on Count 1. The court imposed a prison sentence of 15 years to life on Count 1, with three-year and five-year terms to be served consecutively

10.

on the specifications attached to that count. The three-year specification attendant to Count 3 was also ordered to be served consecutively. The court found that Counts 4 and 5 merged for purposes of sentencing and imposed a sentence on Count 4 of a minimum stated term of ten years and a maximum indefinite term of 15 years, also to be served consecutively.

{¶ 28} In Lucas County case No. CR22-2996, the court imposed a stated minimum prison term of seven years and a maximum indefinite prison term of ten-and-a-half years. The sentences in Lucas County case Nos. CR22-2195 and CR22-2996 were ordered to be served consecutively to each other and to the prison term imposed in Lucas County case Nos. CR22-2152.

{¶ 29} Evans appealed. He assigns the following errors for our review:

FIRST ASSIGNMENT OF ERROR:

THE TRIAL COURT ERRED IN DENYING APPELANT'S CRIM.R. 29 MOTION.

SECOND ASSIGNMENT OF ERROR

THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## II. Law and Analysis

{¶ 30} Evans challenges the sufficiency and weight of his convictions. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential

11.

elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212 (1978). "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.*

{¶ 31} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 32} For ease of discussion, we will first consider Evans's sufficiency and weight challenges as they relate to the murder, felonious assault, and weapons convictions. We will then consider his challenges as they relate to the gang participation conviction.

12.

### A. Sufficiency and Weight of the Murder, Felonious Assault, and Weapons Convictions

{¶ 33} As to the murder, felonious assault, and weapons convictions, Evans argues that the State failed to present sufficient evidence that he perpetrated these offenses. He also maintains that his convictions were against the manifest weight of the evidence.

### 1. Sufficiency of the Evidence

{¶ 34} Evans argues that the State failed to present sufficient evidence that he committed the offenses here. He complains that (1) there were no eyewitnesses to the crime; (2) there was no crime scene evidence linking Evans to the crime; (3) the witnesses who reported seeing the Dodge Charger identified the driver as a white male in his thirties, heard only a few popping sounds (not 31 shots), and conceded that the blue Dodge Charger that ran the red light on Airport may have been a different blue Dodge Charger than the one they saw at the intersection where the shooting occurred; (4) the security footage does not show that he was in the vehicle, and it is unclear if the Dodge Charger even appeared in the YMCA video; (5) there was no DNA or fingerprint evidence that he was in the vehicle on January 16, 2022; (6) there was no evidence linking him to the Glock that was recovered by police on February 8, 2022; (7) while there was a video of Evans holding a firearm in the backseat of the Charger, this video was taken more than three hours before the shooting and was not included in Dailey's cellphone mapping; and (8) the cellphone mapping data was inconclusive of his exact location, demonstrates merely that he was in the same general area as the Charger and G.M.'s apartment, and shows that he was in two places at the same time. Evans

13.

acknowledges that circumstantial evidence carries the same weight as direct evidence, but he argues that because there was no credible eyewitness testimony, the jury relied on "unsupported inferences stacked upon unsupported inferences."

{¶ 35} The State responds that the evidence here was sufficient to establish that Evans was one of the perpetrators of these offenses. It emphasizes that it had no duty to show that Evans was a shooter or that he fired the bullets that struck the victim because it presented evidence that allowed the inference that Evans "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal."

{¶ 36} First, the State claims, there was undisputed evidence that Ro Gang and Body Up were feuding, including Detective Bocik's testimony and the defendants' social media posts, text message exchanges, and music videos containing explicit threats and references to past deaths and shootings. It maintains that although it was not required to establish a motive, there was undisputed testimony that the victim's next-door neighbor was a member of the Body Up Gang, allowing jurors to reasonably conclude that the victim was mistakenly targeted. The State contends that the cell tower data allowed for the inference that Evans moved with Harris and Richardson in the Charger on the afternoon and evening of the shooting, in the vicinity of the victim's apartment, and there was video evidence that the Charger traveled toward the site of the shooting at 7:48 p.m., just moments before it occurred. And it points out that Evans' presence in the Charger was documented by Richardson at 4:27 p.m., at which time Evans held a firearm in his lap. The State claims that given the synchronized change in cell tower locations used by

14.

the devices around the time of the shooting and near the site of the shooting, the jurors could infer that the defendants were together in the Charger.

{¶ 37} Evans challenges only the identification element of the offenses of which he was convicted. He correctly asserts that there was no direct evidence—eyewitnesses to the shooting, DNA or fingerprint evidence, confessions—that Evans was involved in G.M.'s shooting death. The State's case relied solely on circumstantial evidence.

{¶ 38} "Circumstantial evidence is proof of certain facts and circumstances . . . from which the jury may infer other, connected facts, which usually and reasonably follow according to the common experience of mankind." *State v. Stringer,* 2013-Ohio-988, ¶ 31 (12th Dist.), citing *State v. Ortiz–Bajeca,* 2011-Ohio-3137 (12th Dist.). The Ohio Supreme Court has repeatedly recognized that circumstantial evidence has the same probative value as direct evidence. *State v. Franklin,* 62 Ohio St.3d 118, 124, (1991); *State v. Treesh,* 90 Ohio St.3d 460, 485 (2001); *State v. Martin*, 2017-Ohio-7556, ¶ 112. The identity of a perpetrator may be established by circumstantial evidence. *State v. Aekins*, 2023-Ohio-322, ¶ 79 (10th Dist.). In fact, "[a] conviction can be based on circumstantial evidence alone." *Stringer* at ¶ 31, citing *State v. Shannon,* 2010-Ohio-6079, ¶ 10 (12th Dist.).

{¶ 39} The State claimed that the victim was shot by the occupants of a blue Dodge Charger, and Evans was one of those occupants. Its theory of the case was that Evans and his co-defendants shot G.M. because they mistakenly confused him with his next-door neighbor, W.P., who is a member of a rival gang. The State contended that Evans, Harris, and Richardson staked out the victim's location in the afternoon, then

15.

carried out the shooting a few hours later. It presented the following evidence to support its position.

{¶ 40} First, G.M. ordered food at the Burger King drive thru while a blue Dodge Charger, clearly visible in surveillance video, waited in a parking lot behind the restaurant. Witnesses reported seeing a blue Dodge Charger run a red light travelling toward Holland-Sylvania Road, and surveillance video captured a car with that body style driving down Holland-Sylvania Road just behind a car with a body style similar to the victim's Chevy Malibu. All of this occurred at times corresponding with the time of the shooting. Indisputably, the Chevy Malibu ended up in the southbound lane of Holland-Sylvania where it intersects with Perrysburg-Holland Road. Witnesses testified that they saw the blue Dodge Charger at that intersection too. They reported hearing a noise that sounded like a car backfiring.

{¶ 41} Second, the suspects were connected to a blue Dodge Charger. Video surveillance from Moody Manor Apartments places Evans and Harris in a blue Dodge Charger, albeit four days after the shooting.

{¶ 42} Third, Richardson entered an *Alford* plea and was found guilty in connection with G.M.'s death. A photo placed Evans in a Dodge Charger with Richardson approximately four hours before the shooting, holding a gun, one of which was the same type of gun that was used to commit the shooting. Ninety minutes before the shooting, Richardson texted that he was with "Chi"; Harris's first name is Chicha.

{¶ 43} Fourth, the cell location data places Harris, Evans, and the blue Dodge Charger near one another and in the same area of town as the locations of the video

16.

cameras and the scene of the shooting. The State's witness conceded that cell location data is not capable of pinpointing a person's precise location at a precise moment in time, however, she also testified that it is sufficiently accurate to provide general location information when the device periodically communicates with nearby towers, with the caveat that a device will not always connect with the closest tower.

{¶ 44} Finally, 11 days before the shooting, Richardson had in his hands the very Glock that was used in the shooting. A little more than three hours before the shooting, Richardson and Evans were in a Dodge Charger with a Glock and a Draco. Days after the shooting, Harris communicated on social media about selling a Glock and a Draco, and the State presented evidence that it is common for a person to sell a firearm shortly after it has been used in a crime. The same weapon Richardson had in his hands on January 5, 2022—identifiable by its serial number—was recovered from other individuals on February 8, 2022.

{¶ 45} We find that taken together, if believed, the totality of the evidence was sufficient to establish that Evans, along with his co-defendants, perpetrated G.M.'s shooting death.

### 2. Weight of the Evidence

{¶ 46} Evans also argues that his convictions were against the manifest weight of the evidence. Again, he complains that no witness placed him at the crime scene "through either direct or forensic evidence." He emphasizes that there was no DNA or fingerprint evidence linking him to the blue Dodge Charger and he claims that detectives conceded that they were not 100% sure that the vehicle that appeared in the YMCA

17.

security video was actually the Charger. Evans maintains that the cellphone tower mapping evidence was vague and inconclusive and could only place his mobile device somewhere in the general area of the other mobile devices associated with this case. He claims there is no evidence that he was still in the Charger or with the co-defendants at the time G.M. was shot. Evans points out that the witnesses who saw the Charger identified the driver as a white male in his late thirties, and the defendants are Black males who are not in their thirties. Finally, Evans insists that the image of Evans and Richardson in the backseat of the Charger was taken at 4:27 p.m., and G.M. was not killed until several hours later.

{¶ 47} The State responds that the jury was well-informed of the limitations of the evidence of the cell tower evidence and that the precise location of the devices could not be determined. Likewise, it claims, the witnesses who saw the Charger acknowledged that it was dark and they did not get a good look at the individuals in the Charger. The State insists that the jury was free to consider the circumstances and assign whatever weight it deemed appropriate. It emphasizes, however, that a reversal on manifest-weight grounds requires more than mere inconsistency, and here there was ample evidence from which the jury could find that Evans participated in the murder, including Evans's demonstrated support of Ro Gang in his music videos, which contained threatening lyrics and shows of disrespect towards rival gangs; his presence in the Charger close in time to the shooting; his presence in the Charger in the vicinity of the victim's apartment only a few hours before the shooting; the location of his cellphone in proximity to the Charger's infotainment system and Harris's phones, near the area of the victim's apartment and the

18.

shooting; and his connection to the vehicle as shown by the Moody Manor video just a few days later.

{¶ 48} Finally, the State maintains that the jury could also properly consider the evidence against Richardson and Harris, including threatening messages Harris exchanged with other individuals and Harris's attempt to sell the Draco and Glock firearms just days after the murder.

{¶ 49} The State correctly observes that "[r]eversal based on manifest weight grounds requires more than inconsistency[.]" *State v. Giles,* 2021-Ohio-2865, ¶ 84 (6th Dist.). Certainly, the jury was presented with facts that could have led it to a different verdict. It was informed that the witnesses initially believed that the driver of the Charger was white and they testified that they did not hear enough backfiring to account for 31 shots. The video of Evans in the Charger was taken several hours before the shooting, and the Moody Manor footage tying him to the blue Dodge Charger was from four days later. The cell tower data provided only general location data and could not pinpoint a person's exact location. But these were all facts to be weighed and considered by the jury along with all the other evidence.

{¶ 50} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). "The jurors are free to believe some, all, or none of each

19.

witness' testimony and they may separate the credible parts of the testimony from the incredible parts." *State v. Hill*, 2024-Ohio-2744, ¶ 24 (7th Dist.), citing *State v. Barnhart*, 2010-Ohio-3282, ¶ 42 (7th Dist.), citing *State v. Mastel*, 26 Ohio St.2d 170, 176 (1971). "When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible." *Id.,* citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

{¶ 51} Here, the jury weighed the evidence and made reasonable inferences based on the totality of the evidence that was presented. We cannot say that the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice requiring reversal. This is not the exceptional case where the evidence weighs heavily against the conviction. Accordingly, with respect to the murder, felonious assault, and weapons convictions, we find Evans's assignments of error not well-taken.

### B. Sufficiency and Weight of the Gang Participation Conviction

{¶ 52} With regard to the gang participation conviction, Evans argues that the State failed to present sufficient evidence that that he actively participated in a criminal gang. He also maintains that his conviction was against the manifest weight of the evidence.

### 1. Sufficiency of the Evidence

{¶ 53} Evans acknowledges that Detective Bocik provided extensive testimony about Toledo gangs. Without specifically addressing any of the elements required to convict under R.C. 2923.42(A), Evans merely argues that Detective Bocik never arrested

20.

him and never witnessed him commit any criminal acts. To prove a violation of R.C. 2923.42, however, the State need not show that a specific police officer has arrested or witnessed the defendant commit a crime. These are not elements of the offense.

{¶ 54} Under R.C. 2923.42(A), "[n]o person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall purposely promote, further, or assist any criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, or shall purposely commit or engage in any act that constitutes criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code." In other words, a violation of this statute occurs when (1) a criminal gang exists; (2) the accused actively participates in the criminal gang; (3) he knows that the criminal gang engages in or has engaged in a pattern of criminal gang activity; (4) he purposely promotes, furthers, assists, commits, or engages in any criminal conduct.

{¶ 55} *Existence of the gang.* As to the existence of the gang, the State points to Detective Bocik's testimony concerning the size of Ro Gang, the origin of its name, the common words, symbols, and numbers associated with the gang, its rivals and allies, and offenses committed by its members (including those committed by Harris, Jones, and Hannah, a member of Stickney 33, a gang aligned with Ro Gang), which included numerous felonies or acts committed by a juvenile that would be a felony if committed by an adult.

{¶ 56} We agree with the State that there was sufficient evidence of the existence of the gang. Clearly, Detective Bocik testified that Ro Gang exists. He identified when it

21.

was formed, the size of the gang, the words and symbols the gang rallies around, and its allies and rivals. He named at least seven people believed to be members of the gang. The State presented sufficient evidence of this element.

{¶ 57} *Active Participation in the Gang.* As to Evans's active participation in the gang, the State argues that this element was satisfied by evidence that Evans' forearm was tattooed with a motto associated with Ro Gang, he was depicted in a video wearing a t-shirt with the same motto, he recorded videos and songs supporting Ro Gang's rivalry with Moody Manor Bloods and Body Up (one called "RG Response"), he made incriminating social media posts, and he was photographed making hand signs disparaging Ro Gang's rival shortly before the shooting in this case. The State further argues that Evans's own criminal activity—including a resisting arrest conviction, a firearms violation, and his conduct in the present case, which, in the words of a co-defendant, was "Blood shit"—is also evidence of his active participation in the gang.

{¶ 58} This court has recognized that "active participation" requires the state to show that the defendant "actually–not just nominally–took part in the gang." *State v. Smith*, 2017-Ohio-776, ¶ 38 (6th Dist.). This requires proof that the defendant has performed "some role to benefit the gang." *Id.* at ¶ 39.

{¶ 59} Here, in addition to providing evidence of Evans's close associations with other members of Ro Gang, Detective Bocik testified at length about Evans and Harris's use of music and videos to communicate threats to and boast about violence committed against rival gang members. *See also State v. Smith*, 2017-Ohio-776, ¶ 25 (6th Dist.) (reciting gang task force member's testimony about the importance of music to gangs and

22.

its use as a vehicle for "send[ing] messages"). Some of those music videos were admitted as trial exhibits and played for the jury. Moreover, pictures of Evans's tattoo with the word "reckless" was also displayed, as were photos of him displaying gang signs. *See State v. Miller*, 2012-Ohio-1263, ¶ 88 (9th Dist.) (finding that defendant's active participation in gang was demonstrated through gang-related tattoos, photographs of him displaying gang signs or standing alongside others displaying gang signs, and prior convictions for crimes committed with other suspected gang members). The State presented sufficient evidence of this element.

{¶ 60} *Knowledge that the Gang Engages in a Pattern of Criminal Gang Activity and Purposeful Promotion, Furtherance, Assistance, Commission, or Engagement in Criminal Conduct.* As to Evans's knowledge of the pattern of criminal activity and purposeful promotion, furtherance, assistance of, or commission of or engagement in any criminal conduct, the State maintains that it introduced evidence that Evans, Harris, and Richardson all engaged in criminal activity as defined by the statute. It points to Evans' failure-to-comply conviction dated December 28, 2022, and his conviction of improper handling of a firearm journalized on May 3, 2022; Richardson's firearms-related offense dated October 3, 2019; and another attempted murder committed by Harris five days after the shooting at issue in this case. It also points out that Evans's own criminal activity— particularly his firearms charge—reflects the type of criminal activity that Detective Bocik said is characteristic of gangs.

{¶ 61} The State also cites Ohio law holding that evidence of an underlying felony accompanying the gang charge may be considered in determining this element of the

23.

offense. It reiterates that Evans was recorded in the back seat of the Dodge Charger handling a firearm in the vicinity of the victim's apartment, just a few hours before the shooting, and it points to videos and photographs showing Evans disparaging and threatening rival gangs and their members.

{¶ 62} R.C. 2923.41(B)(1) defines "pattern of criminal gang activity" to mean that "persons in the criminal gang have committed, attempted to commit, conspired to commit, been complicitors in the commission of, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of two or more" specified offenses. Felonies or acts committed by a juvenile that would be felonies if committed by an adult are included among these specified offenses. R.C. 2923.41(B)(1)(a). A "pattern of criminal gang activity" is established when at least one of the two or more specified offenses is a felony, at least one of the two or more specified offenses occurs on or after January 1, 1999, the most recent of the specified offenses occurs within five years of another of the specified offenses, and the specified offenses are committed on separate occasions by two or more persons. R.C. 2923.41(B)(2). And under R.C. 2923.41(C), "criminal conduct" includes those offenses that are specified as felony offenses under R.C. 2923.41(B)(1). This court has recognized that this element may be established by the same evidence the trier-of-fact relied on to conclude that the defendant committed the underlying felony that was tried along with the gang charge. *State v. Brown*, 2021-Ohio-4034, ¶ 61 (6th Dist.).

{¶ 63} Here, Detective Bocik testified that gang members often commit crimes together including homicide, felonious assault, drug trafficking, and robberies. Evans has

tattoos featuring words and symbols associated with Ro Gang, performed music containing threats and boasting of instances of gang violence committed against rival gangs, and has convictions for attempted improper handling of a firearm in a motor vehicle and failure to comply with a signal of a police officer. Evans is alleged to have committed the shooting in this case with Harris and Richardson. Richardson made admissions associating himself with Ro Gang, and photos were found on his phone connecting him to Ro Gang and Evans. Harris was convicted of attempted murder and felonious assault for a shooting at a Gas & Go gas station where gang activity commonly occurs, which he committed with another member of Ro Gang, and he has a felony drug-trafficking conviction relating to an incident.

{¶ 64} The State presented sufficient evidence of these elements.

### 2. Weight of the Evidence

{¶ 65} Evans also argues that his gang-participation conviction was against the manifest weight of the evidence. He acknowledges that the State introduced evidence of Evans pictured in photos and videos with known gang members and their associates, but he urges that while he may have been associated with particular people based on friendship, culture, and neighborhood, these associations, "and the adoption of the many facets of gang culture," are not "definitive proof" that he actively participated in a gang that was engaged in criminal activity. Additionally, Evans maintains that Detective Bocik conceded that he had never seen Evans commit a criminal act.

{¶ 66} The State responds that Evans' manifest-weight arguments mainly mirror the arguments made with respect to the sufficiency of the evidence. But it points out that

25.

Evans did more to support his gang than merely wear particular clothing or display certain tattoos. It insists that the evidence allowed the jury to conclude that he actively participated in the planning and the execution of the shooting of G.M.—"Blood shit—on behalf of Ro Gang. It maintains that the circumstantial evidence against Evans was overwhelming, and the jury cannot be said to have lost its way and created a manifest miscarriage of justice requiring reversal here.

{¶ 67} We agree with the State. We find that taken together, it was reasonable for the jury to conclude that Evans actively participated in a criminal gang, he had knowledge that the gang engages in a pattern of criminal activity, he engaged in criminal activity with other gang members, and has purposely promoted, furthered, assisted, committed, and engaged in such criminal conduct. We cannot say here that the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice requiring reversal. This is not the exceptional case where the evidence weighs heavily against the conviction.

{¶ 68} Accordingly, with respect to Evans's gang-participation conviction, we find his assignments of error not well-taken.

### III. Conclusion

{¶ 69} The State presented sufficient evidence that he committed the murder, felonious assault, and weapons offenses here, and that he actively participated in a criminal gang. Moreover, we cannot say that Evans's convictions were against the manifest weight of the evidence. The jury weighed the evidence and made reasonable inferences based on the evidence that was presented. We cannot conclude that it clearly

26.

lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice requiring reversal. This is not the exceptional case where the evidence weighs heavily against the conviction. We find Evans's first and second assignments of error not well-taken.

{¶ 70} We affirm the October 2, 2023 judgment of the Lucas County Court of Common Pleas. Evans is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.                    _____
                                                        JUDGE
Myron C. Duhart, J.

Charles E. Sulek, P.J.                   _____
CONCUR.                                               JUDGE

                                                 _____
                                                        JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.