[Cite as *State v. Smith*, 2017-Ohio-776.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

| | |
|---|---|
| State of Ohio | Court of Appeals No. L-15-1027 |
| Appellee | Trial Court No. CR0201401829 |
| v. | |
| Deontay Smith | **DECISION AND JUDGMENT** |
| Appellant | Decided: March 3, 2017 |

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Tim A. Dugan, for appellant.

* * * * *

**JENSEN, P.J.**

{¶ 1} Defendant-appellant, Deontay Smith, appeals a judgment entered in the

Lucas County Court of Common Pleas convicting him of aggravated murder, felonious

assault, discharge of a firearm upon or over a roadway, participating in a criminal gang,

and various gang and firearm specifications. For the reasons that follow, we affirm the judgment of the trial court.

{¶ 2} On the evening of February 2, 2014, Michael Macklin was killed in a drive-by shooting while sitting in his car at a stop sign in East Toledo.

{¶ 3} The Lucas County Grand Jury returned a seven-count indictment against appellant: one count of aggravated murder in violation of R.C. 2903.01(A) and (F), an unclassified felony ("Count 1"); one count of murder in violation of R.C. 2903.02(B), an unclassified felony ("Count 2"); one count of felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree ("Count 3"); one count of felonious assault in violation of R.C. 2903.11(A)(2) and (D), a felony of the second degree ("Count 4"); one count of discharge of a firearm upon or over a roadway in violation of R.C. 2903.11(A)(3) and (C)(4), a felony of the second degree ("Count 5"); one count of participating in a criminal gang, in violation of R.C. 2923.42(A) and (B), a felony of the second degree ("Count 6"); and one count of tampering with evidence in violation of R.C. 2931.12(A)(1) and (B), a felony of the third degree ("Count 7). Counts 1 through 6 contained firearm and criminal gang specifications.

{¶ 4} The following evidence was adduced at the trial by jury.

{¶ 5} On the evening of February 2, 2014, Jamarr Hayward, the sole passenger in Macklin's car, walked into downtown Toledo to meet up with friends at a club. Moments before he arrived, a fight had broken out inside the club and no one was allowed to enter. While considering what to do next, Hayward saw his cousin, Michael Macklin, walk out

2.

of the club. Hayward asked Macklin for a ride home to the East side of Toledo. Macklin agreed.

{¶ 6} As they neared the destination, Macklin stopped his car at a stop sign at the intersection of Walden and Greenwood. Moments later, a sport utility vehicle passed Macklin's car on the left. Shots were fired. Bullets shattered Macklin's driver-side window. Hayward ducked when he heard the glass shatter. By the time he sat back up, Hayward realized Macklin had been shot in the face and back. Hayward called 911. Macklin was transported to the hospital. He died of his wounds.

{¶ 7} Blair Hueston grew up in Toledo, but moved out to Holland, Ohio, with his parents when he was about ten years old. On the evening of February 2, 2014, Hueston drove his mother's sport utility vehicle to Toledo. After picking up his friend Anthony Green, Hueston drove to the home of Jerry McNeal. Several people were at the McNeal home, including Jerry's twin brother, Gerald McNeal, Cleophaus, Devan Stayford, Daryl Whitiker, and appellant. According to Hueston, everyone at McNeal's home was either affiliated with or a member of a street gang known as the Stickney 33 Bloods.

{¶ 8} While he hung out and drank alcohol at Jerry McNeal's house, Hueston observed two guns. One gun was on the counter and a second gun, a small black handgun, was in appellant's hand.

{¶ 9} After about 20 minutes, Hueston drove Anthony Green and Cleophaus to a club in downtown Toledo. Jerry McNeal, Gerald McNeal, Daryl Whittaker, Devan Stayford, and appellant rode in other vehicles. After about 15 minutes at the club, a fight

3.

broke out and the crowd dispersed. Hueston gave Green the keys to his mother's sport utility vehicle.

{¶ 10} When Hueston and Cleophaus finally made their way to the sport utility vehicle, Green and appellant were already sitting in it. Appellant was in the front passenger seat. Hueston agreed to give appellant a ride to a girl's house. As they drove, appellant gave him directions where to go. Hueston testified, "the whole time I'm not noticing we [were] actually following a car until * * * he told me to go around the car, and that's when it happened." Appellant pulled the small black handgun out from under his shirt and fired the gun six, seven, or eight times. Hueston explained, "that's when I sped off because my blood – my heart running and everything thinking I never been in that situation."

{¶ 11} Hueston testified that when Detective Bob Schroeder showed up at his home a few days later, he knew why the detective was there. Hueston was taken into custody. The first time Hueston spoke with Detective Schroeder, he lied about who he was with and what happened on the evening of February 2, 2014. The second time Hueston spoke with Detective Schroeder, Hueston gave a different version of events, this time indicating that a person named Jay fired the fatal shots. Hueston spoke with the detective on a few more occasions, each time giving a slightly different version of events. Then, on the Friday before trial, Hueston told Detective Schroeder what he described as "the truth," a version of events identical to his testimony on the stand. When asked why he was untruthful during the first few interviews with Detective Schroder, Hueston

4.

indicated that he was scared for his life and the lives of his family members. Hueston claimed he had been threatened "through songs on Facebook and stuff." He explained, "[p]eople think I am a snitch."

{¶ 12} On cross-examination, Hueston indicated that the downtown Toledo club was filled with people from numerous gangs including Bloods, South Sides, North Sides, and West Side Crips. There were also people there with no gang affiliation, including the victim, Michael Macklin.

{¶ 13} On re-cross, Hueston explained the difference between being affiliated with and being a member of the Stickney 33 Bloods:

Q. Mr. Nunnari asked you if you were part of the gang, and you didn't answer in the affirmative. What did you say?

A. I said yes, but by association because I grew up and I hung with them.

Q. How do you get in with a gang?

A. Jumped in, commit a crime.

Q. Have you ever done that?

A. No.

Q. Do you have any felonies?

A. No.

Q. So you are telling us here that how you get into Stickney 33 is to commit a crime?

A. Or jumped in.

Q. What does that mean?

A. Get basically group of people on you, they fight you.

Q. Have you ever done that?

A. No.

Q. So is that what you mean when you say by association you might be considered a Stickney 33?

A. I hang with them.

Q. Are you one of them?

A. No.

{¶ 14} Officers from the Toledo Police Department explained how they used bullets, cartridge casings, and statements of various individuals to identify the weapon used to shoot Michael Macklin. The weapon—a Glock model 22, 40-caliber pistol—and ammo was found during a raid of Jerry McNeal's home.

{¶ 15} Jerry McNeal testified that he and Michael Macklin were friends; they worked together at Johnson Controls. McNeal indicated that he was the only one from his group of friends that knew the victim. On the night Macklin died, McNeal had some contact with Macklin at the club.

{¶ 16} Jerry McNeal testified that on February 4, 2014, his home was "raided" and police officers confiscated marijuana, heroin, gang photos, and a handgun. McNeal was taken into custody. Appellant's girlfriend posted McNeal's bond. Upon his release,

6.

McNeal went to visit appellant. They "had some words" about the handgun found in McNeal's home. Appellant said to McNeal, "my bad for leaving it in there."

{¶ 17} When questioned about his affiliation with the Stickney 33 Bloods, Jerry McNeal indicated that he was a member. McNeal testified that his sister once made appellant a birthday cake decorated with red frosting and gang signs. McNeal denied ever participating in any gang related activity with appellant.

{¶ 18} Moses Kimble testified that he met appellant in the county jail while being held on a burglary charge. While in custody, Kimble spoke with appellant 10-15 times. On one occasion, appellant stated, "you know, man, at first I was just going to take the deal * * * fuck it, I did it. It is what it is." Later, Kimble wrote the prosecution a letter and offered to testify against appellant. In his letter Kimble stated, "All I ask for in return is 3 years community control in another city."

{¶ 19} Matthew Kroggel testified that he bought heroin from appellant daily— more than 100 times—after his regular heroin dealer was incarcerated. On three of four occasions, appellant asked Kroggel if he could purchase a firearm. Eventually Kroggel acquiesced. Kroggel sold appellant a Glock model 22, 40-caliber pistol sometime between Christmas and New Year's Day, 2013.

{¶ 20} Detective William Noon is a certified gang specialist on the Toledo Police Gang Task Force. Detective Noon testified that during his decade on the task force, he had dealt with the Stickney 33 Bloods "hundreds of times."

7.

{¶ 21} In Detective Noon's expert opinion, appellant is either affiliated with or a member of the Stickney 33 Bloods. Detective Noon testified that appellant's street name is Flex, sometimes spelled "Fleex." Detective Noon explained, "[t]he Stickney 33s replace their E with three so it's common to see two E's that would stand for the three." According to Detective Noon, the number 33 is significant to the gang, and "they'll use their fingers to mark 33. They'll tag, or they'll use graffiti in certain areas claiming those specific things."

{¶ 22} Detective Noon testified that he first became acquainted with appellant months before Macklin's death while responding to a gang related disturbance at a bar on Lewis and Laskey in Toledo. During that initial meeting, Detective Noon asked appellant if he was a member of the Stickney 33 Bloods. Appellant denied membership in any gang, but admitted he "hung around" members of the Stickney 33 Bloods.

{¶ 23} Detective Noon further testified that on various occasions, various task force members witnessed appellant in the company of known members of the Stickney 33 gang, including Jerry McNeal, Gerald McNeal, Persueus Easter, and Timothy McCulum.

{¶ 24} Detective Noon testified that Facebook is an important investigative tool for the gang task force because it shows associations and nicknames of known and suspected gang members. At trial, the state introduced a printout of a color photograph depicting a young man holding up three fingers on each hand. Detective Noon testified

8.

that the printout was a screenshot taken from Facebook and that he believed the young man in the photograph was appellant.

{¶ 25} Detective Noon testified that music is important to gangs. He has found that gangs often "send messages" through rap songs. Detective Noon explained,

Sometimes it's kind of hard to understand, but you have to listen to it a few times to gain the message, and there is a lot of times gangs will talk about the beefs they have with each other through music and talk about what they've done to each other or to someone through music.

{¶ 26} Detective Noon testified that "you can't do anything without money." Gangs need money to fulfill their needs. There are a lot of ways gangs make money. Some gangs—including the Stickney 33 Bloods—sell drugs to support their activities. Various members of Stickney 33 have been prosecuted for possession and trafficking in drugs.

{¶ 27} Upon motion, the trial court dismissed Count 7 of the indictment and the gang specification attached to Count 6. At the conclusion of the trial, the jury found appellant guilty of one count of aggravated murder, one count of murder, two counts of felonious assault, one count of discharge of a firearm upon or over a roadway, and one count of participating in a criminal gang, in violation of R.C. 2923.42(A) and (B), a felony of the second degree. The jury found appellant guilty of all attached gang and firearm specifications.

9.

{¶ 28} Appellant's convictions for Counts 1, 2 and 3 (aggravated murder, murder and felonious assault) merged for sentencing. The trial court imposed a sentence of life in prison with parole eligibility after 25 years, plus an additional 11 years for the attached specifications (five years for the discharging firearm from a motor vehicle specification, three years for the using a firearm specification, and three years for the participating in a criminal gang specification).

{¶ 29} As to Count 4, felonious assault, appellant was ordered to serve a term of seven years in prison plus an additional 11 years for the attached specifications (five years for the discharging firearm from a motor vehicle specification, three years for the using a firearm specification, and three years for the participating in a criminal gang specification).

{¶ 30} As to Count 5, discharging a firearm upon or over a roadway, appellant was ordered to serve a term of 10 years in prison plus an additional 11 years for the attached specifications (five years for the discharging firearm from a motor vehicle specification, three years for the using a firearm specification, and three years for the participating in a criminal gang specification).

{¶ 31} As to Count 6, participating in a criminal gang, appellant was ordered to serve a term of seven years in prison plus an additional eight years for the attached specifications (five years for the discharging firearm from a motor vehicle specification and three years for the using a firearm specification).

10.

{¶ 32} The court ordered the sentences on all counts to be served consecutively. The court further ordered that appellant is subject to five years of mandatory postrelease control as to Count 1, three years of mandatory postrelease control as to Count 4, five years of mandatory postrelease control as to count 5, and three years of mandatory postrelease control as to Count 6.

{¶ 33} Appellant filed a timely notice of appeal and asserts five assignments of error for our review.

**First Assignment of Error**

{¶ 34} In his first assignment of error, appellant asserts that his "convictions for Participating in a Criminal Gang were not supported by legally sufficient evidence."

{¶ 35} The first issue before the court under this assignment of error is what type of evidence is sufficient to prove the element of "active participation" under R.C. 2923.42(A), the participating in a criminal gang offense. The second issue involves what type of evidence is sufficient to prove R.C. 2941.142, the criminal gang participation specification.

{¶ 36} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally adequate to support a jury verdict as to all elements of the crime. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The proper analysis under a sufficiency of the evidence standard is "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'"

11.

*State v. Williams*, 74 Ohio St.3d 569, 576, 660 N.E.2d 724 (1996), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**Participating in a Criminal Gang Offense**

{¶ 37} Appellant alleges that the evidence produced by the state was insufficient to sustain a conviction under R.C. 2923.42(A) because it established nothing more than a passive association with the Stickney 33 Bloods. R.C. 2923.42(A) provides that

> No person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall purposely promote, further, or assist any criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, or shall purposely commit or engage in any act that constitutes criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code.

{¶ 38} The phrase "actively participates" is not defined by the statute. Thus, it shall be construed in context and given its common, ordinary meaning. *See State v. Dorso*, 4 Ohio St.3d 60, 62, 446 N.E.2d 449 (1983); R.C. 1.42. The common and ordinary meaning of "active" is "actual, not just nominal." *Webster's New World College Dictionary* 14 (4th Ed.2008). "Participate" is "to have or take a part or share with others (in some activity, enterprise, etc.)." *Id.* at 1050. Thus, the active participation element of the criminal gang statute requires the state demonstrate that appellant actually—not just nominally—took part in the criminal gang. *See State v. Williams*, 148 Ohio App.3d 473, 2002-Ohio-3777, 773 N.E.2d 1107, ¶ 19 (10th Dist.)

12.

(R.C. 2923.42 does not "establish guilt by association alone," nor does it "punish nominal, inactive purely technical, or passive membership, even if such is accompanied by knowledge and intent."); *see also State v. Stallings*, 150 Ohio App.3d 5, 2002-Ohio-5942, 778 N.E.2d 1110, ¶ 16 (9th Dist.) ("[T]he common and ordinary meaning of 'actively participates in a criminal gang' is involvement with a criminal gang that is more than nominal or passive.").

{¶ 39} Various courts across the country have issued decisions elucidating the active participation element found in criminal gang statutes similar to the Ohio statute. In interpreting what constitutes criminal gang involvement that is more than nominal or passive, we find persuasive the Supreme Court of Delaware's holding that one who actively participates in any criminal street gang performs some role to benefit the gang. *Taylor v. State*, 76 A.3d 791 (Del.2013). Passive association with street gang members, without more, is not a violation of the statute.

{¶ 40} Here, after viewing the evidence in a light most favorable to the state, we find that a rational trier of fact could have found the active participation element of R.C. 2923.42(A) proven beyond a reasonable doubt.

{¶ 41} At trial, Detective Noon testified that the Stickney 33 Bloods is a street gang with at least 75 identified members. The gang has certain identifying factors, including hand signs and tattoos. Detective Noon testified that appellant has been seen with active members of the gang on several occasions. On one occasion, Detective Noon personally observed appellant with known Stickney 33 members.

13.

**{¶ 42}** Detective Noon identified a photograph of appellant flashing a gang sign and a photograph of a birthday cake decorated with appellant's name and gang symbols.

**{¶ 43}** The detective further testified that Stickney 33 gang members are known to engage in criminal activities such as selling drugs. Matthew Kroggel testified that he purchased heroin from appellant more than 100 times.

**{¶ 44}** Blair Hueston testified that at the time of the shooting he was friends with several members of the Stickney 33 Bloods, including appellant. Hueston indicated that in order to become a member of the gang, a person must either commit a crime or "get jumped in." Hueston further testified that appellant fired the fatal shots into Macklin's car while he and two other associates of the Stickney 33 Bloods were riding in Hueston's sport utility vehicle. Finally, Blair Hueston testified that he was afraid to reveal the truth to investigating officers early in the investigation because people threatened him for being a snitch with songs and on Facebook.

**{¶ 45}** Relatedly, Detective Noon testified that a song produced by a known Blood member referenced a person named Blair. The trial court allowed the song to be played for the jury. At times, the lyrics are inaudible, but the recording includes perceptible phrases such as: "snitch niggers like Blair we don't play that, shootin in the air we don't play that, shot him in his face, yea we play that, a nigger rob me I don't play that," "niggers trying to hang I don't play that, * * * niggers in my gang I don't play that," "we smoked your boy, guess who's next," "Blair, trying to get fame on my name, we don't play that."

14.

**{¶ 46}** There was sufficient evidence from which the jury could conclude that appellant's participation in the Stickney 33 Bloods was more than passive, nominal membership and that his actions benefitted or in some way advanced the objectives of the criminal gang. Thus, appellant's conviction for participating in a criminal gang in violation of R.C. 2923.42(A) was supported by sufficient evidence.

## Criminal Gang Specification

**{¶ 47}** Appellant alleges that the evidence produced by the state was insufficient to sustain convictions under the criminal gang specifications attached to Counts 1-5 of the indictment.

**{¶ 48}** The gang specification under R.C. 2911.142(A) requires the imposition of a mandatory prison term if an offender commits a felony "that is an offense of violence while participating in a criminal gang."

**{¶ 49}** Detective Noon testified at length about Toledo gang culture in general. He also explained his contact with various members of the Stickney 33 Bloods. The jury heard evidence that appellant had spent the evening prior to the shooting with members and affiliates of the gang. When appellant fired the fatal shots, he was riding in a car with three individuals closely associated with the Stickney 33 Bloods. Less than two months before the shooting, appellant purchased the firearm used to kill Michael Macklin from an individual who regularly purchased heroin from him. Finally, Blair Hueston, an associate of the Stickney 33 Bloods testified that in order to move from associate to member of the gang, one had to either commit a crime or get jumped in.

15.

**{¶ 50}** There was sufficient evidence from which the jury could conclude that the underlying felony offenses were committed while participating in a criminal gang. Thus, the criminal gang specifications attached to Counts 1-5 of the indictment are supported by sufficient evidence.

**{¶ 51}** For the foregoing reasons, appellant's first assignment of error is not well-taken.

### Second Assignment of Error

**{¶ 52}** In his second assignment of error, appellant states: "The Prosecutor for the State of Ohio committed prosecutorial misconduct during its rebuttal closing argument which deprived Appellant of a fair trial."

**{¶ 53}** The test for prosecutorial misconduct is whether the prosecutor's conduct at trial was improper and prejudicially affected the substantial rights of the defendant. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). A prosecutor's misconduct during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial. *State v. Apanovitch*, 33 Ohio St.3d 19, 24, 514 N.E.2d 394 (1987). A reversal for prosecutorial misconduct is not warranted if it is clear beyond a reasonable doubt that the outcome of the trial would have been the same absent the misconduct. *State v. Smith*, 14 Ohio St.3d 13, 15, 470 N.E.2d 883 (1984); *State v. Vallejo*, 6th Dist. Lucas No. L-98-1090, 1999 Ohio App. LEXIS 4907 (Oct. 18, 1999).

16.

**{¶ 54}** Appellant complains that the state committed prosecutorial misconduct and prejudiced his right to a fair trial when the prosecutor made the following statements during closing argument:

> 21 witnesses the State called. One witness Defense called. On my count, 11 of the witnesses the state called, no questions. Well, conveniently Counsel wants to rely upon that lack of questioning now in closing arguments. Well, DNA evidence. There is no hard DNA evidence. You remember, no questions for our ballistics expert from Counsel. Why? Ladies and gentlemen, I submit to you because they answered questions with me about why there might not be DNA. Why there might not be fingerprints. Would the State of Ohio like to have DNA in the case? Of course. But like I said we don't get to pick and choose what our evidence is. It is presented to us. He didn't ask those questions because he knew the answer would not be good for him or his client.

**{¶ 55}** Generally, the state may comment freely on "what the evidence has shown and what reasonable inference may be drawn therefrom." *Lott* at 165. Upon review of the closing argument as a whole, we find that the prosecutor's remarks did not deprive appellant of a fair trial. *See State v. Carpenter*, 116 Ohio App.3d 615, 623, 688 N.E.2d 1090 (2d Dist.1996) (explaining that in reviewing remarks made by a prosecutor during summation, the closing argument must be reviewed in its entirety). While we find some of the prosecutor's remarks and suggestions inappropriate, we cannot say that absent

17.

those remarks and suggestions, the jury would not have found appellant guilty beyond a reasonable doubt. Accordingly, appellant's second assignment of error is not well-taken.

### Third Assignment of Error

{¶ 56} In his third assignment of error, appellant states: "Appellant received ineffective assistance of counsel as Trial Counsel failed to object to the prosecutor's closing argument."

{¶ 57} Citing the same comments that are the subject of his second assignment of error, appellant asserts that trial counsel's performance fell below an objective standard of reasonable representation when he failed to object to the prosecutor's closing arguments. Comments, he argues, that "attempted to shift the burden of proof from the State to Appellant via Trial Counsel's decision making about trial tactics."

{¶ 58} "To establish a claim of ineffective assistance of counsel, a defendant must show that his or her counsel's actions were outside the wide range of professionally competent assistance, and that prejudice resulted by reason of counsel's actions." *State v. Ullman*, 12th Dist. Warren No. CA2002-10-110, 2003-Ohio-4003, ¶ 43, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To show prejudice, a defendant must prove there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Wilson*, 12th Dist. Madison No. CA2013-10-034, 2014-Ohio-2342, ¶ 17, quoting *Strickland* at 694.

18.

{¶ 59} First, we note that the trial court repeatedly advised the jury that closing arguments are not evidence and are merely the attorneys' interpretation of the evidence. The court further instructed the jury to consider only the evidence and to disregard answers that were stricken and exhibits that were referred to during trial but not admitted into evidence. We presume the jury followed the court's instructions.

{¶ 60} Second, in appellant's second assignment of error we found that the prosecutor's statements during closing argument did not amount to prosecutorial misconduct. Thus, appellant's counsel did not render ineffective assistance by failing to object to them. Appellant's third assignment of error is not well-taken.

## Fourth Assignment of Error

{¶ 61} In his fourth assignment of error, appellant states: "Appellant's convictions fell against the manifest weight of the evidence."

{¶ 62} In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. In reviewing the entire record, a reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983), paragraph three of the syllabus. A conviction should not be reversed as

against the manifest weight of the evidence only in the most exceptional case in which the evidence weighs heavily against the conviction. *Id.*

{¶ 63} In addition to the evidence discussed in appellant's first assignment of error, Blair Hueston identified appellant as the shooter, Matthew Kroggel testified that he sold appellant the gun later identified as the weapon used in the shooting, Jerry McNeal testified that appellant apologized for leaving the gun at McNeal's home, Moses Kimble testified that appellant appeared to regret passing up a plea deal because he "did it" and that "it is what it is."

{¶ 64} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "'to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). The trier of fact may take note of any inconsistencies in the evidence and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, quoting *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

20.

**{¶ 65}** Here, the jury was provided with information about any incentives Hueston, Kroggel, Kimble and McNeal had to testify against the appellant. They were cross-examined as to their motivations and any inconsistent statements. This is not the exceptional case where the evidence weighs heavily against appellant's convictions. Accordingly, the jury did not lose its way in finding appellant guilty of these offenses. Appellant's fourth assignment of error is not well-taken.

**Fifth Assignment of Error**

**{¶ 66}** In his fifth assignment of error, appellant states: "The Trial Court erred in sentencing Appellant to Post-Release control for Aggravated Murder." We agree the trial court erred and find appellant entitled to a corrected judgment entry.

**{¶ 67}** Appellant was found guilty by a jury of aggravated murder in violation of R.C. 2903.01(A) and (F). In regard to this crime, appellant was ordered to serve a mandatory term of life in prison, with parole eligibility after 25 years. Specific to the aggravated murder conviction, the trial court imposed a 5-year period of mandatory postrelease control.

**{¶ 68}** It has long been held that "'the post-release control statute applies only to felonies of the first, second, third, fourth and fifth degree.'" *State v. Williams*, 7th Dist. Mahoning No. 11-MA-24, 2012-Ohio-1475, ¶ 20, quoting *State v. Young*, 7th Dist. Mahoning No. 09-MA-100, 2011-Ohio-2646, ¶ 68. *See* R.C. 2967.28(B) and (C). Aggravated murder is an unclassified felony to which the postrelease control statute does

not apply. *Id. See also State v. Clarke*, 119 Ohio St.3d 239, 2008-Ohio-3748, 893 N.E.2d 462, ¶ 36.

{¶ 69} The trial court should not have imposed postrelease control for the aggravated murder conviction. Thus, appellant is entitled to a corrected judgment entry deleting language ordering appellant subject to 5-years mandatory postrelease control as to Count 1, aggravated murder. Pursuant to our authority under App.R. 12(A)(1)(a) to affirm, modify, or reverse the judgment appealed, we will modify appellant's sentence to delete the reference to postrelease control as to Count 1, aggravated murder. *See Williams* at ¶ 24. Appellant's fifth assignment of error is well-taken.

## Conclusion

{¶ 70} Based on the foregoing, the judgment of the Lucas County Court of Common Pleas is affirmed in part and modified in part. The trial court's judgment is modified to delete the reference ordering appellant subject to 5 years mandatory postrelease control as to Count 1 of the indictment, aggravated murder, and affirmed in all other respects. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24(A).

Judgment affirmed in part
and modified in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                              _____
                                                                                  JUDGE

Arlene Singer, J.

                                         _____
James D. Jensen, P.J.                                      JUDGE
CONCUR.

                                         _____
                                                                                  JUDGE