[Cite as *State v. Harris*, 2024-Ohio-5732.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

    Appellee

v.

Chicha Harris

    Appellant

Court of Appeals No.  L-23-1274
L-24-1055

Trial Court No.  CR0202202996
CR0202202195

**DECISION AND JUDGMENT**

Decided:  December 6, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, Chicha Harris, appeals the September 29, 2023 judgments of the Lucas County Court of Common Pleas, convicting him of two counts of murder and one count of felonious assault, with firearm and discharge firearms specifications, discharge of a firearm on or near prohibited premises,

improperly handling of a firearm, and participating in a criminal gang.  For the following reasons, we affirm the trial court judgments.

## I.  Background

{¶ 2} Chicha Harris, David Evans, and Ronald Richardson, II, were indicted in Lucas County case No. CR22-2195 on charges of murder, a violation of R.C. 2903.02(A) and 2929.02, along with specifications under R.C. 2941.145(A), (B), (C), and (F), and 2941.146(A), (B), and (D), and as to Harris only, an additional specification under R.C. 2941.149 (Count 1); murder, a violation of R.C. 2903.02(B) and 2929.02, along with specifications under R.C. 2941.145(A), (B), (C), and (F), and 2941.146(A), (B), and (D), and as to Harris only, an additional specification under R.C. 2941.149 (Count 2); felonious assault, a violation of R.C. 2903.11(A)(2) and (D), a first-degree felony, along with specifications under R.C. 2941.145(A), (B), (C), and (F), and 2941.146(A), (B), and (D), and as to Harris only, an additional specification under R.C. 2941.149 (Count 3); discharge of a firearm on or near prohibited premises, a violation of R.C. 2923.162(A)(3) and (C)(4) (Count 4); and improperly handling of a firearm, a violation of R.C. 2923.16(B) and (I) (Count 4).  They were also charged in Lucas County case No. CR22-2996 with participating in a criminal gang, a violation of R.C. 2923.42, a second-degree felony.

{¶ 3} Richardson entered a plea of guilty under *North Carolina v. Alford* to the lesser-included offense of involuntary manslaughter with three-year and five-year gun specifications, and participating in a criminal gang.  The charges against Harris and

2.

Evans were tried together to a jury beginning September 17, 2023.  The following evidence was presented at trial.

## A.  G.M. is murdered.

{¶ 4} On January 16, 2022, at 8:00 p.m. and 8:04 p.m., two 9-1-1 callers reported seeing a silver Chevy Malibu, riddled with bullet holes, stopped at the intersection of Perrysburg-Holland and Holland-Sylvania Roads.  Lucas County Sherriff's Deputy Sergeant Justyn McKnett was the first officer to arrive on the scene.  He opened the car door and found G.M. slumped in the driver's seat, unresponsive.  He had been shot.  Efforts to resuscitate him were unsuccessful.

{¶ 5} The Lucas County Coroner determined that G.M. died of a gunshot wound that pierced his left arm and entered his chest; the shots were fired left to right from the driver's side of the vehicle and it was surmised that G.M.'s left arm was on the steering wheel when he was shot.  He had also been shot in the left hip.  The car had been struck by numerous bullets.

{¶ 6} Testing of bullets and casings found at the scene, retrieved from the vehicle, and extracted from G.M.'s body revealed that 31 shots had been fired from three different guns.  Bullet fragments and casings for nine millimeter, .45 caliber, and .40 caliber firearms were found.  Eleven shell casings, one bullet recovered from the scene, and one of the bullets extracted from G.M.'s body at autopsy were fired from a .40 caliber Glock.  A projectile fired from a .45 caliber firearm was extracted from G.M.'s spine.  And

3.

projectiles fired from a nine-millimeter firearm were recovered from the headrest and ashtray of G.M.'s vehicle.

## B. Police narrow in on a blue Dodge Charger.

{¶ 7} A couple saw a report of the shooting on the news and realized that they had been in the vicinity of the shooting around the time it occurred. They contacted police and notified them that they had seen a white man in a dark blue Dodge Charger with a spoiler run a stoplight on Airport Highway driving toward Holland-Sylvania Road; Harris, Evans, and Richardson are Black. The couple was driving from Spring Meadows Shopping Center toward their apartment on Perrysburg-Holland Road. When they got to the intersection of Perrysburg-Holland and Holland-Sylvania Roads, they saw the Charger again and heard what they thought was a car backfiring; they did not hear what would account for the number of shots that had been fired.

{¶ 8} Shortly before responding to the scene, while attending to a vandalism report at nearby Valley Stream Apartments, Sergeant McKnett and Sergeant Brandon Winkleman heard what they believed were firecrackers.

{¶ 9} Uneaten Burger King food found in G.M.'s car led officers to the Burger King at Spring Meadows Shopping Center. They pulled surveillance video from the Burger King, located on Airport Highway, Virtual PC, located in Spring Meadows Shopping Center behind the Burger King, and the Wolf Creek YMCA, located on Holland-Sylvania Road. Those video recordings showed that G.M. ordered at Burger King's drive-through window at 7:41 p.m. While G.M. was in the drive-through line, a

4.

blue Dodge Charger pulled into the parking lot behind Burger King, parked for two minutes, then left. Several minutes later, the YMCA surveillance camera recorded what appeared to be the Malibu being followed by what appeared to be the Charger. Surveillance video from St. Joan of Arc school, on Heatherdowns Boulevard, was also reviewed, however, the blue Charger was not visible in that footage.

{¶ 10} After the witnesses reported seeing a blue Dodge Charger, Lucas County Sherrif's Detective Williams Scroggs issued a BOLO—a be on the lookout—so that other law enforcement would know that he was interested in information relating to a car with that description. He learned that a blue Dodge Charger was also of interest to Toledo Police in an unrelated incident and had been sent to a TPD storage facility.

### C. DNA in the blue Dodge Charger lead police to suspects.

{¶ 11} In the early morning hours of January 21, 2022, Toledo police found the blue Dodge Charger abandoned at the corner of Delaware and Glenwood Avenue. They impounded the car and obtained a search warrant, seeking evidence of who had occupied the vehicle. They collected and tested DNA evidence, which indicated that Harris, Shomari Hannah, and Christopher Jones had been in the vehicle at some point.

{¶ 12} The Toledo Police also gathered surveillance video from Moody Manor Apartments from January 20, 2022. The surveillance video showed that approximately six hours before the vehicle was found, the blue Charger pulled into the Moody Manor parking lot. A group of men exited (and eventually reentered) the vehicle. While they were outside of the vehicle, two men posed for photographs in front of a tree—the video

5.

showed flashes and lights from a cell phone. Harris was identified among the men and was wearing a distinctive puffy blue jacket. Police found a picture on social media of Harris—wearing that same puffy blue jacket—standing next to Evans in front of a tree at Moody Manor, both holding firearms. So although Evans's DNA was not found on items tested from the vehicle, the detective concluded that Evans had also occupied the Charger.

### D. A possible gang connection is discovered.

{¶ 13} Detective Scroggs obtained search warrants for G.M.'s home, cell phone, and social media accounts, and he talked to family members, friends, and co-workers. He found nothing out of the ordinary that would have made G.M. the target of a shooting. A confidential source did report, however, that G.M.'s immediate next-door neighbor, W.P., was a member of the Body Up gang.

{¶ 14} The Body Up gang and Moody Manor Bloods were known to have an ongoing feud with Ro Gang Bloods, another Toledo gang with approximately 15 to 20 members, and most of the city's other Bloods-affiliated gangs. Body Up uses a hand sign, performed by holding the ring finger down so that the index and middle fingers stay up together to form the number "2" and the pinky stays up to form the number "1." The "2" and "1" signify 2100 Kent—the location of Moody Manor. Rival gangs sometimes show disrespect to Body Up by pointing the hand signal down instead of up. Ro Gang members identify with the word "reckless," the letters "RR," and the number "1023," a

6.

tribute to a friend (Romear) who died on October 23, 2018, after whom the gang was named.

### E. Harris is believed to belong to Ro Gang.

{¶ 15} Toledo Police Detective Nicholas Bocik is a detective in the TPD's gang task force. Based on their known associations, general intelligence he has gathered or accessed over his almost 12 years investigating gang activity in Toledo, monitoring of social media activity, and information obtained through search warrants and from confidential informants, Detective Bocik concluded that Harris, Evans, and Richardson are members of Ro Gang.

{¶ 16} Detectives obtained a search warrant permitting them access to Harris's social media accounts. In a photo posted on his account, Harris is pictured with other known gang members making the Body Up hand signal pointing downward. He is pictured holding a gun in another photo. In conversing with others in Instagram messaging in late 2021 and early 2022, Harris uses the phrase "on Bloods," which Detective Bocik said signifies his association with the Bloods gang. The State maintained that the following conversation between Harris and C.W. demonstrates his gang affiliation and active participation:

> [C.W.]: you feel me doe myboy I'm tired of [racial slurs] I ain't heard a shot yet from blood. I'll never pay no one to go do some shit I can do myself and ain't paying no [racial slur] to go do something I wouldn't do that's called trying to buy some respect everybody want to play boss role[.] . . . Aye send the lil brothers on all type mission they can do they self but when it's time to pay Laywers (sic) and get [racial slurs] out of jail and check on [racial slurs] kids and shit all the boss shit go out the window[.]

7.

[Harris]: I just said this shit sad [racial slurs] ain't real u gotta have yo self out here.

. . .

[C.W.]: I swear myboy all [racial slurs] thinking bout is some money witch is cool cuz we all need money to live but damn don't it comes a point where [racial slurs] supposed to say fuck money and all that when life in danger this lil money fucking [racial slur] head up [racial slur] ain't did shit around this bitch baby ten gone jeezy and Rell then got hit up and [racial slurs] living there regular life still I'm not biting my tongue for no [racial slur] to much bitch shit going on around my way but I'm kill all them bitch ass [racial slurs] screaming body up and Kent[.] . . . And I been seeing ya active myboy stay safe and focus with this shit myboy yo ass can hit my line anytime for anything money convo I'm fucking with ya myboy stay dangerous[.]

. . .

[Harris]: On bloods [racial slurs] can't b out here head first an they not [racial slurs] b faking while other [racial slurs] stepping an catching cases an shit this shit outta pocket[.]

Detective Bocik said that "Baby Ten" was the street name of a murdered associate of the Ro Gang.

{¶ 17} Additional Instagram messaging alludes to the feud between Ro Gang and Moody Manor Bloods:

[Harris]: Wondering why you keep watching me blood[.]

[rayshitty_22]: Same reason you start watching me[.] . . .

[Harris]: Bro u got hit 3 times in the face an ain't did shit I ain't arguing w u[.] . . .

[rayshitty_22]: On Kent I did not get hit three times where you getting this from an on kent my jaw not wired an I can still talk . . . I already been all over you boys an I'm out here day an night on bang[.]

[Harris]: Ok we gone delete the posts leave it in the streets[.]

[rayshitty_22]: I will see you before you see me blood I been had you in the web the Mack saved you on kent I'm hip to all them whips you in on kent an a [racial slur] will never walk me down that's why ya'll had to shot up the house [racial slur] run from me on kent[.]

[Harris]: why you ain't do shit then[?] . . . U cap never seen me ever[.] . . . post again . . . Delete post leave it in the streets u keep texting me for wat[?]

[rayshitty_22]: Lol blood you was just eating pizza the other day, you get yo headlight fix??? . . . Lol you always say why you watching me you boys been watching every since I got shot you better stay out that black thing I'm gone flip that bitch[.]

[Harris]: wat black thing[?] . . . U let me know yaw dumb on bloods[.]

[rayshitty_22]: Lol yea keep playing stupid better watch how you talk to me little [racial slur] they love me over on kent change yo little group up[.] . . . Lol y'all mad I didn't die huh[?]

Detective Bocik explained that "on Kent" is like saying "on my life." He testified that "I'm hip to all them whips" means "I know all the vehicles that you are in."

{¶ 18} Finally, Detective Bocik said that additional messaging alludes to a shooting that Harris committed at a Gas & Go gas station at Cherry and Bancroft Streets:

[alwaysondaswerve]: & on reck y yak ain't dead yet I would of dropped him in the store[.]

[Harris]: Yak ain't dead cause I ain't go in the store an teno blick was in the whip[.]

[alwaysondaswerve]: . . . Y'all did movie shit[.]

[Harris]: Right on bloods I ain't do shit movie an I ain't even have on no mask[.]

[alwaysondaswerve]:  Boy u got out the car shooting wit yo head down[.] . . . I seen the video on stone[.]

{¶ 19} Relative to that shooting, the parties stipulated that on March 24, 2023, Harris entered a plea of guilty and was found guilty of attempt to commit murder with a three-year firearm specification, felonious assault with a one-year firearm specification, and two counts of attempt to commit felonious assault.  The parties agreed that Harris committed these offenses with Hannah and Jones.  Hannah is an identified member of Stickney 33 Bloods, and Jones is a member of Ro Gang.  Detective Bocik testified that Hannah's street name is Teno.

{¶ 20} A recording of a four-way video call was also produced in response to the search warrant.  Harris and Evans participated in that call.  They talked about firearms, including an XD, a Glock, and a Draco, and one of the participants held a gun during the video call.  Harris uses the phrase "on Bloods" during the call and displays the downward 21 sign.

{¶ 21} Music videos were played for the jury.  In one, Harris performs a song called Switches and Dracs.  The video features an image of a ghost, which Detective Bocik said symbolizes a deceased member of the Moody Manor Bloods.  Evans appeared in the video as well.

{¶ 22} Another music video called Blow that Smoke features Harris, Evans, and others.  Three people in the video are wearing a t-shirt with the word "reckless" written on it—the word Ro Gang rallies around.  Detective Bocik said that Evans has a tattoo of

10.

the same image. In the song, Evans sings the lyrics "catch an op and hit they block and leave them on the flow," "RG shit," and "last [racial slur] smoke on Ro got put up in a box," which Bocik interpreted, respectively, as a threat, a reference to Ro Gang, and a statement that the last person who spoke ill of Ro Gang was killed.

{¶ 23} Detective Bocik testified that Richardson made admissions associating himself to Ro Gang, and photos were found on his phone connecting him to Evans and other identified members of Ro Gang.

{¶ 24} Detective Bocik explained that gang members engage together in committing crimes including homicide, felonious assault, drug trafficking, and robberies. He said that drug trafficking, burglaries, and robberies help gang members buy weapons and assist members who have been incarcerated, and violent crimes are often committed to show dominance, exercise control, or exact revenge. The State introduced certified judgment entries showing that Harris, Evans, and Richardson all have prior convictions or juvenile adjudications for offenses that gang members commonly commit. Richardson entered an *Alford* plea in this case to involuntary manslaughter and participating in a criminal gang. Harris has a criminal history that includes three separate juvenile adjudications for aggravated robbery and adult felony convictions for trafficking in fentanyl, attempt to commit murder, felonious assault, and attempted felonious assault. And Evans has a criminal history that includes convictions of attempted improper handling of a firearm in a motor vehicle and failure to comply with a signal of a police officer.

11.

**F. Cellular data places the suspects (and the car) near the incident.**

{¶ 25} After obtaining the VIN for the Charger, Detective Scroggs obtained a warrant for the cellular signals emitted by the vehicle's infotainment system. He submitted the data he obtained to Ohio's Bureau of Criminal Investigations for mapping. Cell site analysis was also performed of Harris and Evans's cell phones, and text messages were extracted from Richardson's phone.

{¶ 26} At 4:27 p.m. on January 16, 2022, Richardson created a video of himself with Evans in the backseat of a Charger. Richardson had a Glock pistol and a Draco firearm and Evans had a pistol. At 6:22 p.m.—approximately 90 minutes before the shooting—someone (possibly a person named K.J.) texted Richardson and asked where he was. He responded "I'm in a car with Chi." The State's position was that "Chi" is Chicha Harris. At 7:18 p.m., Richardson received another text inquiring as to his whereabouts. At 7:19 p.m., he responded "Blood shit."

{¶ 27} Beth Dailey, a criminal intelligence analyst with BCI, reviewed cell location information for January 16, 2022, from 4:00 to 4:45 and 7:00-8:30 p.m. She testified that from 4:00 to 4:10 p.m., the Charger and Harris and Evans's cell phones frequently used the same cell towers within a short time of each other. Between 7:00 and 7:30 p.m., the Charger and Evans and Harris's phones used the same cell tower near Airport Highway and I-475—where the victim's apartment was located. A Cellebrite report showed that Richardson's cell phone was in the same vicinity at 7:28 p.m. The Charger and Evans's phone also used cell towers in the area where the Charger was

12.

visible in the surveillance videos. And after witnesses saw the Charger turn onto Perrysburg-Holland Road, cell tower location data showed that Evans's phone was near Heatherdowns Boulevard.

{¶ 28} From 7:50 to 7:55 p.m., Evans and Harris's phones were in the same general location along I-475 after the U.S. 23 split, and Evans's phone communicated with a cell tower along I-475 and the U.S. 23 split. Evans and Harris's phones were in the same general area after the shooting.

{¶ 29} There were many caveats and limitations noted with respect to using this data to determine the suspects' location. Dailey testified that some towers may not service all cellular carriers, for instance. Also, the best signal is not always the cell tower closest to the location of the device, and analysts are not provided information concerning how far the signal of a particular cell tower reaches. The data cannot pinpoint a user's exact location, but it can help identify a general location. Here that information was consistent with Evans, Harris, and Richardson being around each together in the Springfield Township area and in the vicinity of the Charger around the time of the shooting. The State's position was that the defendants staked out the victim's location in the late afternoon, then followed him in the early evening, culminating in the shooting.

### G. The suspects have connections to the guns.

{¶ 30} Police recovered one of the guns used in the shooting. A Glock model 23 Gen5 .40 caliber pistol was recovered on February 8, 2022. It was determined that 11 casings found at the scene had been fired from this weapon. Richardson appeared in a

13.

video dated January 5, 2022, holding this very gun—the serial number was visible in the video. Shortly after the shooting, Harris instant messaged with someone concerning the sale of a Draco and a Glock. Detective Bocik testified that criminals often sell firearms after they have been used to commit a crime.

## H. The jury convicts Harris and Evans.

{¶ 31} The jury found Harris and Evans guilty of all counts. On September 29, 2023, the trial court found that in Lucas County case No. CR22-2195, Counts 2 and 3 are allied offenses of similar import that merge with Count 1 for sentencing purposes. The State elected to have Harris sentenced on Count 1. The court imposed a prison term of 15 years to life on Count 1, with three-year and five-year terms to be served consecutively on the specifications attached to that count. The three-year specification attendant to Count 3 was also ordered to be served consecutively. The court found that Counts 4 and 5 merged for purposes of sentencing and imposed a sentence on Count 4 of a minimum stated term of ten years and a maximum indefinite term of 15 years, also to be served consecutively.

{¶ 32} In Lucas County case No. CR22-2996, the court imposed a stated minimum prison term of seven years and a maximum indefinite prison term of ten-and-a-half years. The sentences in Lucas County case Nos. CR22-2195 and CR22-2996 were ordered to be served consecutively to each other and to prison terms imposed in Lucas County case Nos. CR22-2769, CR22-1080, and CR23-1710.

14.

**{¶ 33}** Harris appealed.  He assigns the following errors for our review:

I.  The findings of guilty were against the manifest weight of the evidence.

II.  The finding of guilty for Participating in a Criminal Gang was not supported by the manifest weight of the evidence.

## II.  Law and Analysis

**{¶ 34}** Harris challenges all of his convictions on the basis that they were against the manifest weight of the evidence.  When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997).  We do not view the evidence in a light most favorable to the state.  "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'"  *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 388.  Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983).

**{¶ 35}** Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and

15.

discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). "The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts." *State v. Hill*, 2024-Ohio-2744, ¶ 24 (7th Dist.), citing *State v. Barnhart*, 2010-Ohio-3282, ¶ 42 (7th Dist.), citing *State v. Mastel*, 26 Ohio St.2d 170, 176 (1971). "When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible." *Id.,* citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

### A. Murder and Felonious Assault

{¶ 36} It is undisputed that a murder and felonious assault were committed here. What is at issue is identity—i.e., whether Harris participated in perpetrating these crimes. Harris argues that the weight of the evidence failed to place the Charger at the scene of the shooting, and the cell tower data failed to place Harris anywhere near the crime scene.

{¶ 37} There was no direct evidence that Harris shot G.M. The State's case was based on circumstantial evidence. "Circumstantial evidence is proof of certain facts and circumstances . . . from which the jury may infer other, connected facts, which usually and reasonably follow according to the common experience of mankind." *State v. Stringer,* 2013-Ohio-988, ¶ 31 (12th Dist.), citing *State v. Ortiz–Bajeca,* 2011-Ohio-3137 (12th Dist.). The Ohio Supreme Court has repeatedly recognized that circumstantial evidence has the same probative value as direct evidence. *State v. Franklin,* 62 Ohio

16.

St.3d 118, 124, (1991); *State v. Treesh,* 90 Ohio St.3d 460, 485 (2001); *State v. Martin*, 2017-Ohio-7556, ¶ 112. The identity of a perpetrator may be established by circumstantial evidence. *State v. Aekins*, 2023-Ohio-322, ¶ 79 (10th Dist.). In fact, "[a] conviction can be based on circumstantial evidence alone." *Stringer* at ¶ 31, citing *State v. Shannon,* 2010-Ohio-6079, ¶ 10 (12th Dist.).

**{¶ 38}** Here, the State presented evidence that the occupants of a blue Dodge Charger committed the crime here. A blue Dodge Charger was clearly visible in the surveillance video from behind the Burger King restaurant at the same time that G.M. ordered at the drive through. Witnesses reported seeing a blue Dodge Charger run a light and travel toward Holland-Sylvania Road, and surveillance video captured a car with that body style driving down Holland-Sylvania Road just behind a car with a body style similar to the victim's Chevy Malibu. All of this occurred at times corresponding with the time of the shooting. Indisputably, the Chevy Malibu ended up in the southbound lane of Holland-Sylvania where it intersects with Perrysburg-Holland Road. Witnesses testified that they saw the blue Dodge Charger at that intersection too. They reported hearing a noise that sounded like a car backfiring.

**{¶ 39}** "Reversal based on manifest weight grounds requires more than inconsistency[.]" *State v. Giles,* 2021-Ohio-2865, ¶ 84 (6th Dist.). The fact that the witnesses thought the driver was white and they did not hear enough backfiring to account for the number of shots fired were facts to be weighed and considered by the jury along with all the other evidence.

17.

{¶ 40} The State presented evidence that the suspects were connected to a blue Dodge Charger. Video surveillance from Moody Manor places Harris and Evans in a blue Dodge Charger four days after the shooting. DNA evidence confirms that Harris was in the blue Dodge Charger at some point. Whether Harris was an occupant of that same vehicle on January 16, 2022, was an issue that needed to be weighed and considered by the jury along with all the other evidence.

{¶ 41} The State presented evidence that Richardson entered an *Alford* plea and was found guilty in connection with G.M.'s death. A photo placed Evans in a Dodge Charger with Richardson approximately four hours before the shooting, holding guns, one of which was the same type of gun that was used to commit the shooting. Ninety minutes before the shooting, Richardson texted that he was with "Chi"; Harris's first name is Chicha. Whether Richardson—already convicted of the crime—was still with Harris and Evans shortly before 8:00 p.m. when the crime occurred was an issue that needed to be weighed and considered by the jury along with all the other evidence.

{¶ 42} Dailey conceded that cell location data is not capable of pinpointing a person's precise location at a precise moment in time. However, she also testified that it is sufficiently accurate to provide general location information when the device periodically communicates with nearby towers; the device will not always connect with the closest tower. Here, the cell location data places Harris, Evans, and the blue Dodge Charger near one another and in the same area of town as the locations of the video cameras and the scene of the shooting. That the cell data was consistent with Harris,

18.

Evans, and the blue Dodge Charger being near where the shooting occurred was a fact that needed to be weighed and considered by the jury along with all the other evidence.

{¶ 43} The State presented evidence that 11 days before the shooting, Richardson had in his hands the very Glock that was used in the shooting. A little more than three hours before the shooting, Richardson and Evans were in a Dodge Charger with a Glock and a Draco. Days after the shooting, Harris was communicating on social media about selling a Glock and a Draco, and the State presented evidence that it is common for a person to sell a firearm shortly after it has been used in a crime. The same weapon Richardson had in his hands on January 5, 2022—identifiable by its serial number—was recovered from other individuals on February 8, 2022. Even though there was no direct evidence that Harris had in his possession the exact weapons that were used in the shooting, his attempt to sell weapons of the same make just days after the shooting, and the fact that his already-convicted alleged accomplice was pictured with the Glock used in the shooting, were facts that needed to be weighed and considered by the jury along with all the other evidence.

{¶ 44} The jury weighed the evidence and made reasonable inferences based on the evidence that was presented. We cannot say here that the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice requiring reversal. This is not the exceptional case where the evidence weighs heavily against the conviction. Accordingly, we find Harris's first assignment of error not well-taken.

19.

## B. Participation in a Criminal Gang

{¶ 45} Under R.C. 2923.42(A), "[n]o person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall purposely promote, further, or assist any criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, or shall purposely commit or engage in any act that constitutes criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code."  In other words, a violation of this statute occurs when (1) a criminal gang exists; (2) the accused actively participates in the criminal gang; (3) he knows that the criminal gang engages in or has engaged in a pattern of criminal gang activity; and (4) he purposely promotes, furthers, assists, commits, or engages in criminal conduct.

{¶ 46} *Existence of the Gang.*  Harris does not dispute that Detective Bocik testified that Ro Gang was formed sometime between October 23, 2018, and early 2019.  The State insists that it produced ample evidence of its existence.  It emphasizes that Detective Bocik explained the origin of the name of the gang, the common words, symbols, and numbers used by its members, the identities of its rivals and allies, and the size of the gang, and he identified at least four suspected members of the gang in addition to Harris, Evans, and Richardson.  We agree with the State that the jury's conclusion that this element of the offense was satisfied is not against the manifest weight of the evidence.

20.

**{¶ 47}** *Active Participation in the Gang.* Harris maintains that the State failed to establish his active participation in Ro Gang because he never admitted to being involved in a gang, Detective Bocik did not know when he became a member or how he joined, and he was never described as wearing clothes or tattoos associated with the gang. He claims that the State showed only that he had a loose affiliation with people from the same neighborhood who spent time together and made music videos together. Although Harris acknowledges that the State introduced photos of him with other suspected members of the gang, he contends that it did not make clear how those photos show that he benefited the gang.

**{¶ 48}** The State challenges Harris's claim that its evidence showed only a "loose affiliation of people from the same neighborhood spending time together and making music videos." It insists that it provided evidence of Harris's active participation in the gang. It points to evidence that Harris made veiled threats in a social media exchange with someone associated with Moody Manor or Body Up Bloods, recorded songs and videos actively supporting Ro Gang's rivalry with Body Up, made incriminating social media posts, and was depicted making hand signals disparaging Body Up just before the shooting in this case.

**{¶ 49}** This court has held that "active participation" requires the state to show that the defendant "actually–not just nominally–took part in the gang." *State v. Smith*, 2017-Ohio-776, ¶ 38 (6th Dist.). This requires proof that the defendant has performed "some role to benefit the gang." *Id.* at ¶ 39. The State presented evidence that Harris (1)

21.

has been pictured with other known gang members disrespectfully displaying the Body Up hand signal; (2) uses the phrase "on Bloods" when communicating with others; (3) has created music videos with known gang references; (4) has communicated on social media about the gang's rivalries; (5) in messages with a friend, was noted to be "active" and lamented that some people were "catching cases," paying for lawyers, getting people out of jail, and checking on people's kids, while others "b fakin" or sending others out to perform missions they could perform themselves; and (5) conversed with someone on social media about committing a shooting with Hannah. The jury's conclusion that this element of the offense was satisfied is not against the manifest weight of the evidence.

{¶ 50} *Knowledge that the Gang Engages in a Pattern of Criminal Gang Activity and Purposeful Promotion, Furtherance, Assistance, Commission, or Engagement in Criminal Conduct.* Harris insists that the State failed to show that his criminal history was part of a pattern of criminal gang activity. He urges that the State failed to prove beyond a reasonable doubt that he was involved in G.M.'s murder, thus it cannot establish that he participated to further any purpose of Ro Gang. Harris also emphasizes that he was convicted of participating in a criminal gang from December 1, 2017 (before the gang was formed), to December 1, 2022. He claims that any criminal conduct he committed from December 1, 2017, to late 2018 or early 2019—including the crimes he committed as a juvenile—could not have been in furtherance of a criminal gang because they occurred before Ro Gang was formed.

22.

{¶ 51} In response, the State points to (1) Harris's depiction in videos, photographs, and social media messages disparaging and making threats against rival gangs and their members; and (2) Harris's criminal convictions for crimes characteristic of gang activity. It highlights Harris's conviction for trafficking in drugs, attempted murder, and felonious assault—crimes committed with other gang members who are aligned in their disrespect of Body Up and Moody Manor Bloods. It points to Detective Bocik's testimony that drug trafficking is a source of revenue enabling gangs to purchase firearms and assist other members during incarceration, and gangs promote violence so they can maintain positions of power or prestige. The State maintains that this evidence also demonstrates Harris's knowledge of the pattern of criminal activity.

{¶ 52} As for offenses allegedly committed before Ro Gang was formed, the State submits that Harris's juvenile adjudications took place four months after Ro Gang was formed. (This assertion is incorrect. Those adjudications are dated eight months *before* the gang was allegedly formed). But in any event, it reiterates that Harris has other convictions for fentanyl trafficking, attempted murder, and felonious assault, that occurred within the relevant time frame.

{¶ 53} R.C. 2923.41(B)(1) defines "pattern of criminal gang activity" to mean that "persons in the criminal gang have committed, attempted to commit, conspired to commit, been complicitors in the commission of, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of two or more" specified offenses. Felonies or acts committed by a juvenile

23.

that would be felonies if committed by an adult are included among these specified offenses. R.C. 2923.41(B)(1)(a). A "pattern of criminal gang activity" is established when at least one of the two or more specified offenses is a felony, at least one of the two or more specified offenses occurs on or after January 1, 1999, the most recent of the specified offenses occurs within five years of another of the specified offenses, and the specified offenses are committed on separate occasions by two or more persons. R.C. 2923.41(B)(2). And under R.C. 2923.41(C), "criminal conduct" includes those offenses that are specified as felony offenses under R.C. 2923.41(B)(1). This court has recognized this element may be established by the same evidence the trier-of-fact relied on to conclude that the defendant committed the underlying felony that was tried along with the gang charge. *State v. Brown*, 2021-Ohio-4034, ¶ 61 (6th Dist.).

{¶ 54} Here, Detective Bocik testified that gang members often engage together in committing crimes including homicide, felonious assault, drug trafficking, and robberies. Harris is alleged to have committed the shooting in this case with Richardson and Evans. Richardson made admissions associating himself to Ro Gang, and photos were found on his phone connecting him to Ro Gang. Evans has tattoos featuring words and symbols associated with Ro Gang. Additionally, even setting aside Harris's juvenile adjudications that took place in February of 2018, the parties stipulated that on March 31, 2023, Harris was convicted of attempted murder and felonious assault in connection with a January 21, 2022 shooting at a Gas & Go gas station where gang activity commonly occurs. He committed these offenses with Hannah, an identified member of Stickney 33 Bloods, and

24.

Jones, a fellow member of Ro Gang. Additionally, Harris has a March 31, 2023 felony drug-trafficking conviction relating to an incident alleged to have occurred in July of 2021. The jury's conclusion that these elements of the offense were satisfied is not against the manifest weight of the evidence.

{¶ 55} We find that taken together, the jury's conclusion that Harris actively participated in a criminal gang, had knowledge that the gang engages in a pattern of criminal activity, engaged in criminal activity with other gang members, and purposely promoted, furthered, assisted, committed, and engaged in such criminal conduct was not against the manifest weight of the evidence. We cannot say here that the jury clearly lost its way in resolving evidentiary conflicts. This is not the exceptional case where the evidence weighs heavily against the conviction. Accordingly, we find Harris's second assignment of error not well-taken.

### III. Conclusion

{¶ 56} Concerning all of Harris's convictions, the jury weighed the evidence and made reasonable inferences based on the evidence that was presented. We cannot say here that it clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice requiring reversal. This is not the exceptional case where the evidence weighs heavily against the conviction. We find Harris's first and second assignments of error not well-taken.

25.

**{¶ 57}** We affirm the September 29, 2023 judgments of the Lucas County Court of Common Pleas. Harris is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Christine E. Mayle, J.

Gene A. Zmuda, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.